[No. G037102. Fourth Dist., Div. Three. Dec. 20, 2007.]

SHANE LACHTMAN, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Respondent.

## COUNSEL

Law Offices of Micah Lachtman and Micah Lachtman for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, Richard A. Paul and Kari D. Searles for Defendant and Respondent.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

Shane Lachtman entered the graduate program in the history department (History Department) of the University of California, Irvine (UCI) in the fall of 2001. After his first year, Lachtman was informed of deficiencies in his academic performance and of certain requirements, including improvement in his writing, he needed to meet to advance to the Ph.D. program. In February 2003, three professors in the History Department evaluated Lachtman's writing, determined it had not improved and was not good enough for the Ph.D. program, and concluded Lachtman displayed limited interest in essential areas outside of his narrow field of academic interest. As a result, the History Department denied Shane Lachtman advancement to the department's Ph.D. program, and he ultimately received a master's degree.

Lachtman sued the Regents of the University of California (the University) contending the History Department's decision violated his due process rights.

He also contended the University breached a contract employing him as a graduate student researcher and a contract awarding him a fellowship, and violated his privacy rights by allegedly disclosing his personal information. The trial court granted summary judgment in favor of the University.

United States Supreme Court decisions have long recognized "universities occupy a special niche in our constitutional tradition" and the " 'freedom of a university to make its own judgments as to education includes the selection of its student body.' " (*Grutter v. Bollinger* (2003) 539 U.S. 306, 329 [156 L.Ed.2d 304, 123 S.Ct. 2325].) In keeping with these principles, judicial review of academic decisions, such as the one denying Lachtman advancement in the Ph.D. program, is a "narrow avenue" restrained by "[c]onsiderations of profound importance." (*Regents of University of Michigan v. Ewing* (1985) 474 U.S. 214, 227, 225 [88 L.Ed.2d 523, 106 S.Ct. 507] (*Ewing*).)

Procedural due process does not require a university to provide a student a formal hearing but is satisfied if the university informs the student of its dissatisfaction with the student's academic performance, it informs the student of the consequences of deficient performance, and a decision regarding the student's academic progress is careful and deliberate. (*Board of Curators, Univ. of Mo. v. Horowitz* (1978) 435 U.S. 78, 91–92 [55 L.Ed.2d 124, 98 S.Ct. 948] (*Horowitz*).) When reviewing an academic decision for substantive due process, courts should show "great respect for the faculty's professional judgment" and may not override a faculty's academic decision unless it is "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." (*Ewing, supra,* 474 U.S. at p. 225, fn. omitted.)

Under the undisputed facts, procedural and substantive due process standards were met in this case. Lachtman was given ample notice of the deficiencies in his academic performance, the consequences of those deficiencies, and an opportunity to improve. The decision denying him advancement in the Ph.D. program resulted from the careful and deliberate exercise of professional judgment by History Department faculty members. We cannot second-guess that exercise of professional judgment because the History Department's decision was based on the quality of Lachtman's writing and his limited area of academic interest—indisputably normal academic criteria—and because Lachtman failed to produce evidence of a triable issue of material fact.

The undisputed facts establish the University did not violate Lachtman's privacy rights or retaliate against him for exercising his right of free speech, the basis for two causes of action. Lachtman's contractual claims based on his employment as a graduate student researcher fail as a matter of law

because public employment, including employment by the University of California, is held by statute, not contract, and Lachtman did not plead a statutory claim.

However, Lachtman asserted two separate contractual causes of action based on a diversity fellowship he received, and the University failed to meet its burden of showing the fellowship was not a contract or that it complied with the terms of the fellowship. For these reasons, we reverse summary judgment and remand with directions to enter an order granting summary adjudication of all but those two causes of action.

## STATEMENT OF FACTS[1]

The Ph.D. program in history at UCI typically takes a student seven years to complete. Before a student is formally admitted into the program, the UCI History Department performs a first-year review to evaluate the student's likelihood of successfully completing the program and receiving a Ph.D. After the first-year review, the History Department will take one of four actions: (1) formally admit the student into the doctoral program; (2) recommend the student not continue in the program and permit the student to voluntarily withdraw; (3) recommend the student not continue in the program and offer the student the opportunity to change his or her degree status to a terminal master's degree; or (4) recommend the student's disqualification from the program.

The UCI Graduate Advisor's Handbook (the Handbook) sets minimum standards of academic progress for graduate students. The Handbook also specifies that grade point average alone is not enough to establish satisfactory progress toward a graduate degree: "Satisfactory progress is determined on the basis of both the student's recent academic record and overall performance. . . . [¶] . . . [¶] . . . Unsatisfactory academic progress may be determined on the basis of explicit requirements such as those outlined above. However, the professional judgment of the faculty, upon review of all graduate work undertaken by the student, is paramount."

Lachtman was accepted into UCI's graduate program in history, to begin study in the fall of 2001. A promising candidate with an impressive academic background, Lachtman received a "Diversity Fellowship award" (also called

---

[1] In light of the standard of review we apply to a judgment entered on an order granting summary judgment, we set forth the material facts relating to the issues raised by the pleadings.

a graduate opportunity fellowship).[2] As a fellowship recipient, Lachtman was required to "remain in good academic standing during the tenure of the award."

Lachtman enrolled in History 260A, a required course for United States history graduate students, but attended only two class sessions before dropping it due to a disagreement with the instructor, Professor Sharon Block. After dropping the course, Lachtman received permission from the graduate program committee to substitute a comparable course at the University of California, Los Angeles (UCLA).

After a review was conducted of Lachtman's first year in the graduate program, the History Department advised Lachtman in June 2002 not to continue in the Ph.D. program. The History Department offered Lachtman the option of withdrawing from the program or pursuing a terminal master's degree in lieu of a Ph.D. Lachtman disputed the results of the first-year review and notified the History Department he wanted to continue in the Ph.D. program. Lachtman also sought assistance from the UCI ombudsman, who intervened with the History Department at his request. In a letter dated October 28, 2002, the History Department renewed its recommendation that Lachtman pursue a terminal master's degree, but offered him another opportunity to pursue advancement to the Ph.D. program and identified the steps he would need to take to do so. Lachtman advised the History Department he wanted to remain in the Ph.D. program, but that he would not agree to all the conditions proposed in the History Department's October 28 letter.

In January 2003, the chair of the History Department's graduate program committee sent Lachtman another letter reiterating the steps he was "required to take in order to be re-considered for admission to the History department Ph.D. program." This letter reminded Lachtman he had completed only one of the requirements outlined in the October 28 letter, and granted him an extension to complete the remaining requirements.

Lachtman's grades for the fall quarter of 2002 and winter quarter of 2003 raised his cumulative grade point average to 3.577. He petitioned for and was granted permission to substitute UCLA History 246A for UCI History 260A.

---

[2] A memo dated February 22, 2001, regarding the nominations for graduate opportunity fellowships says of Lachtman: "This is an outstanding student who graduated with a BA in History from the University of California Berkeley. He has had to overcome the obstacle of a hearing disability, which requires continued attention. His performance at the University of California, Berkeley was outstanding with a 3.6 GPA. His letters of recommendation are excellent. He is interested in studying 20th century U.S. history, with a focus on cultural, intellectual and racial history. He has shown resourcefulness in conducting an independent research project, dealing with the question of race in baseball (which he seeks to publish). His interests in studying ethnic minorities stems from his disability."

He submitted two writing samples that were evaluated by three history professors. However, the three professors who reviewed Lachtman's writing samples concluded they did not provide "convincing evidence" Lachtman could perform competent work outside of his narrow field of interest and failed to demonstrate his writing had improved.

As a result, in February 2003, the History Department's graduate program committee unanimously agreed to deny Lachtman advancement to the Ph.D. program. The committee encouraged Lachtman to accept the previous offer to pursue a terminal master's degree; Lachtman ultimately accepted the offer and received his master's degree in July 2003.

In the summer of 2002, Lachtman applied for a position as a graduate student researcher with the University of California Humanities Research Institute (UCHRI). Lachtman received the job offer on October 3, 2002, but the offer was withdrawn when the UCHRI was informed Lachtman was not a Ph.D. student. Lachtman's position as a graduate student researcher later was reinstated. His initial hire date was November 18, 2002, and official separation date was May 1, 2003. He performed work assigned to him in that position until at least March 2003.

### PROCEDURAL HISTORY

Lachtman sued the University for a variety of claims. After numerous demurrers were sustained, Lachtman filed a third amended complaint, the operative complaint in the case. The third amended complaint contains causes of action for (1) invasion of privacy (cause of action 1); (2) breach of contract (causes of action 2 & 6); (3) violation of due process under state and federal law (causes of action 3 & 4); (4) breach of the covenant of good faith and fair dealing (causes of action 5 & 7); and (5) retaliation for exercise of free speech rights under the United States Constitution and the California Constitution (cause of action 8).

The University filed a motion for summary judgment or, in the alternative, summary adjudication of each of Lachtman's causes of action. Lachtman filed a motion for summary judgment of cause of action 2 (breach of the graduate student researcher agreement). The trial court granted the University's motion for summary judgment, denied Lachtman's motion, and entered judgment in the University's favor.

The order granting the University's motion reads, in part, as follows: "It appears to this Court that [Lachtman] has not shown any legally protected privacy interest related to the University's evaluation of [Lachtman]'s academic standing and abilities (first cause of action). It is clear as a matter of

law that a student must be graded and evaluated when he is a member of a graduate program at a University. [Lachtman]'s breach of contract claims for employment (second and fifth causes of action) fail as a matter of law because employment with the Regents is pursuant to statute, not contract. The Court also notes that even if employment with the Regents was contractual, it is difficult to see how a contract was formed. There is no evidence that [Lachtman] was a Ph.D. student in good standing at the time the contract was allegedly formed. [Lachtman]'s contract claims based on his Diversity Fellowship (sixth and seventh causes of action) also fail because there is no evidence that [Lachtman]'s scholarship was a contract with the Regents. It is also the case that [Lachtman]'s due process claims (third and fourth causes of action) cannot survive summary judgment because there is no evidence of either a protected property or liberty right. Likewise, [Lachtman]'s eighth cause of action fails as a matter of law because [Lachtman] did not provide sufficient evidence of retaliation to withstand summary judgment."

Lachtman timely appealed.

PRINCIPLES OF REVIEW

In *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 [107 Cal.Rptr.2d 841, 24 P.3d 493], the Supreme Court described the burden of production on summary judgment motions as follows: "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. [Citation.] There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . [¶] . . . [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (Fns. omitted.)

A motion for summary judgment is properly granted if the moving papers establish there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) Summary judgment "provide[s] courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations,

trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 844.) Under "[t]he historic paradigm for our de novo review of a motion for summary judgment . . . [w]e first identify the issues framed by the pleadings since it is these allegations to which the motion must respond. We then determine if the moving party has established a prima facie entitlement to judgment in its behalf. Only if the moving party has satisfied this burden do we consider whether the opposing party has produced evidence demonstrating there is a triable issue of fact with respect to any aspect of the moving party's prima facie case." (*Rio Linda Unified School Dist. v. Superior Court* (1997) 52 Cal.App.4th 732, 734–735 [60 Cal.Rptr.2d 710].)

DISCUSSION

I.

DUE PROCESS CLAIMS

(CAUSES OF ACTION 3 AND 4)

In causes of action 3 and 4, Lachtman alleged the University violated his substantive and procedural due process rights under article I of the California Constitution and under the Fifth and Fourteenth Amendments to the United States Constitution by (1) depriving him of compensation earned as a graduate student researcher without sufficient process, and (2) depriving him of his position as a Ph.D. student in good standing without adequate procedures and for arbitrary and capricious reasons.

A.

*Graduate Student Researcher Compensation*

Lachtman was hired by the UCHRI as a graduate student researcher for the 2002–2003 academic year. Lachtman received the job offer on October 3, 2002, but the offer was withdrawn when the UCHRI was informed Lachtman was not a Ph.D. student. Lachtman's position as a graduate student researcher later was reinstated with an initial hire date of November 18, 2002, and an official separation date of May 1, 2003. He performed work assigned to him in that position until at least March 2003. Lachtman contends the University paid him only $880 toward his tuition and failed to pay him his salary of $33,396.

College professors and staff members dismissed during the terms of their contracts "have interests in continued employment that are safeguarded

by due process." (*Board of Regents v. Roth* (1972) 408 U.S. 564, 576–577 [33 L.Ed.2d 548, 92 S.Ct. 2701]; see *Connell v. Higginbotham* (1971) 403 U.S. 207, 208 [29 L.Ed.2d 418, 91 S.Ct. 1772] [Supreme Court decisions "proscrib[e] summary dismissal from public employment without hearing or inquiry required by due process"].) Lachtman was not, however, dismissed from his graduate student researcher position. He does not contend he had a right to continue employment beyond the term of his employment; rather, he contends the University failed to pay his salary.

Assuming Lachtman has a protected property interest in any earned but unpaid salary, we conclude he was provided adequate procedures to protect his interest. Employment by the State of California, including employment by the University of California, is held by statute rather than by contract. (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 164–165 [95 Cal.Rptr.2d 10] (*Kim*).) "The University is a statewide administrative agency with constitutionally derived powers. [Citations.] Its employees are public employees. [Citation.] The University is administered by the Regents. [Citation.] Regents have rulemaking and policymaking power in regard to the University; their policies and procedures have the force and effect of statute. [Citation.]" (*Id.* at p. 165.)

The Handbook contains UCI's academic student policies, procedures, and guidelines for graduate students. The Handbook states, "UCI Graduate Student Researcher appointments are covered by University academic personnel policies." Under *Kim, supra,* 80 Cal.App.4th at page 165, the University academic personnel policies controlled the terms of Lachtman's employment and "have the force and effect of statute." The University academic personnel policies are maintained in the Academic Personnel Manual (APM), which "includes policies and procedures pertaining to the employment relationship between an academic appointee and the University of California." The Handbook contains informal grievance resolution procedures for graduate student researchers and refers to the formal grievance procedures in section 140 of the APM if the Handbook's procedures are unsuccessful.

Thus, the University academic personnel policies in the APM controlled the terms of Lachtman's employment and "have the force and effect of statute." (*Kim, supra,* 80 Cal.App.4th at p. 165.) The APM includes a grievance policy for academic appointees intended "to encourage voluntary resolution including mediation when it is desired by both parties." The APM sets forth step-by-step procedures for grievance resolution, starting with attempts at informal resolution, followed by formal grievance procedures, and concluding with an appeal of a formal grievance "not resolved to the satisfaction of the grievant."

Lachtman does not assert the APM procedures or the informal procedures referred to in the Handbook fail to satisfy due process. He did not allege he followed those procedures. He therefore cannot prevail on a claim the University violated due process by failing to pay his salary.

### B.

### *Continued Enrollment in Ph.D. Program*

### 1.

### *Property Interest?*

No United States or California Supreme Court opinion holds a student has a property or liberty interest in continued enrollment in good standing in an academic program. In *Horowitz, supra,* 435 U.S. 78, 91–92, and *Ewing, supra,* 474 U.S. 214, 222, the two seminal cases in the area of a university student's due process rights, the Supreme Court assumed, without deciding, that a public university's academic decisions are subject to judicial review under a due process standard. (But see *Gossett v. Board of Regents for Langston Univ.* (10th Cir. 2001) 245 F.3d 1172, 1181 [student had a property interest in his place in a nursing school program that was entitled to due process protection].) The University has not argued the issue, asserting instead that "even if the court were to conclude there is a protected interest, it is beyond debate that whatever process might conceivably be due has been afforded to Lachtman in this case."

### 2.

### *Procedural Due Process*

*Horowitz, supra,* 435 U.S. 78, remains the definitive case on the scope of a university student's procedural due process rights to remain enrolled in an academic program. In that case, the Supreme Court rejected Horowitz's assertion the University of Missouri-Kansas City Medical School violated her due process rights under the United States Constitution by dismissing her in the last year of her study without a formal hearing. (435 U.S. at pp. 79–80.)

In *Horowitz,* several faculty members expressed dissatisfaction with Horowitz's clinical performance after her first year of study. (*Horowitz, supra,* 435 U.S. at pp. 80–81.) Upon the recommendation of the medical school's council on evaluation, Horowitz was advanced to her second and final year on probationary status. (*Id.* at p. 81.) Faculty dissatisfaction with Horowitz's

performance continued during her second year of study, and, in the middle of the year, the council on evaluation concluded Horowitz should not be considered for graduation in June and recommended, "absent 'radical improvement,' " she be dismissed from the medical school. (*Ibid.*) As an " 'appeal' " of that decision, Horowitz was permitted to take a set of oral and practical examinations and to spend time with seven practicing physicians, who would offer their recommendations whether to permit Horowitz to graduate. (*Ibid.*) Based on those recommendations, the council on evaluation reaffirmed its prior decision to dismiss Horowitz. (*Ibid.*) Later, the council met again and, after receiving further negative reports on Horowitz's performance in rotations, unanimously reaffirmed its recommendation to dismiss Horowitz from the medical school. (*Id.* at pp. 81–82.) After the dean and coordinating committee approved the recommendation, Horowitz appealed to the health sciences provost, who sustained the medical school's decision. (*Ibid.*)

In concluding due process did not require Horowitz be granted a formal hearing, the Supreme Court distinguished academic evaluations of a student from disciplinary determinations, to which the court traditionally attached a full-hearing requirement. (*Horowitz, supra,* 435 U.S. at pp. 86–87.) Unlike disciplinary actions, the decision to dismiss Horowitz "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." (*Id.* at pp. 89–90.)

The Supreme Court explained: "Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking. [¶] Under such circumstances, we decline to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing. The educational process is not by nature adversary; instead it centers around a continuing relationship between faculty and students, 'one in which the teacher must occupy many roles—educator, adviser, friend, and, at times, parent-substitute.' [Citation.] This is especially true as one advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized." (*Horowitz, supra,* 435 U.S. at p. 90.) Affirming the judiciary's limited role in reviewing academic decisions, the court "decline[d] to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship." (*Ibid.*)

How much procedural due process is a university student entitled to before dismissal for academic reasons? The United States Supreme Court has established a student is not entitled to a formal hearing. The Supreme Court concluded Horowitz had been afforded "at least as much due process as the Fourteenth Amendment requires" because "[t]he school fully informed [Horowitz] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment" and "[t]he ultimate decision to dismiss [Horowitz] was careful and deliberate." (*Horowitz, supra,* 435 U.S. at p. 85.)

Thus, under *Horowitz,* a university satisfies the demands of procedural due process if it informs the student of its dissatisfaction with the student's academic performance, it informs the student of the consequences of deficient performance, and a decision regarding the student's academic progress is careful and deliberate. (E.g., *Fenje v. Feld* (7th Cir. 2005) 398 F.3d 620, 626 ["In an academic dismissal it is sufficient that the student was informed of the nature of the faculty's dissatisfaction and that the ultimate decision to dismiss was 'careful and deliberate' "]; *Schuler v. University of Minnesota* (8th Cir. 1986) 788 F.2d 510, 514 ["Dismissal of a student for academic reasons comports with the requirements of procedural due process if the student had prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and if the decision to dismiss the student was careful and deliberate"]; *Harris v. Blake* (10th Cir. 1986) 798 F.2d 419, 422 [same].)

The procedures approved in *Horowitz* were sufficient, but not necessary. (*Horowitz, supra,* 435 U.S. at p. 85.) In light of the need for flexibility and the limitations on judicial review of academic decisions, less protection might be sufficient under the particular circumstances of a case. (*Id.* at pp. 86, 90.)

Here, the University satisfied procedural due process by informing Lachtman of the deficiencies of his performance and the consequences they posed to his advancement, and by making a considered, deliberate decision. Lachtman received a first-year review in June 2002. Professor Kenneth Pomeranz, the chair of the History Department, explained in his declaration that, as a result of the first-year review, the History Department could recommend (1) the student continue in the program, (2) the student withdraw from the program, (3) the student not continue in the program but elect to pursue a terminal master's degree, or (4) the student be disqualified from the program. In Lachtman's case, the first-year review committee evaluated Lachtman's academic performance and informed him: "Based on our overall assessment of your performance in your first-year classes, we see little prospect of your successfully completing the doctoral program, and thus we do not recommend your continuation in the [Ph.D.] program." The committee informed Lachtman he could apply for a candidacy for a terminal master's degree.

Lachtman disputed the first-year review committee's decision and the UCI ombudsman intervened. The History Department agreed to give him another chance to advance to the Ph.D. program by fulfilling the requirements outlined in the October 28, 2002 letter from Pomeranz. That letter stated that for Lachtman to advance to the Ph.D. program, he had to raise his grade point average in the fall quarter to 3.59 overall and to 3.58 in history courses, demonstrate significant improvement in his writing as certified by the graduate program committee, and present a plan to complete History 260A or an approved substitute course. Pomeranz made it clear to Lachtman these conditions were not negotiable.

Lachtman's cumulative grade point average improved and at the end of the winter quarter of 2003 was 3.577. He petitioned for and was granted permission to substitute UCLA History 246A for UCI History 260A. He submitted two writing samples that were evaluated by three History Department professors—Professors Michael Davis, Dave Bruce, and Jon Wiener. However, these three professors reviewed Lachtman's writing samples and concluded they did not provide "convincing evidence" he could perform competent work outside of his narrow field of interest and failed to demonstrate his writing had improved.

Professor Pomeranz stated in a declaration, "[t]he Department's written orientation materials and oral comments at the compulsory orientation explained that the History Department looks for a minimum GPA of 3.6." Lachtman contends he was not given notice of the History Department grade point average requirement and relied on the Handbook, which states that a grade point average of 3.0 is satisfactory. The History Department decided, however, to "overlook" Lachtman's cumulative grade point average of 3.577 because it was so close to the History Department's required minimum of 3.6. Thus, the ultimate decision to dismiss Lachtman from the Ph.D. program was based on an evaluation of his writing samples and assessment of his breadth of intellectual interest, not on his grade point average.

Lachtman asserts there is a factual dispute over who served on the first-year review committee, arguing professors holding favorable opinions of him were excluded from it. The dispute, if real, is immaterial because, as noted *ante*, the History Department granted Lachtman an opportunity after his first-year review to advance in the Ph.D. program by fulfilling certain requirements.

According to Lachtman, the History Department had predetermined to dismiss him from the Ph.D. program and the second chance to stay in the program was illusory. In particular, he relies on an e-mail sent by Carol Sokolov, the graduate academic affairs coordinator in the office of research

and graduate studies, to Ellen Burt, the interim associate dean of graduate study. Lachtman focuses on the following passage from the e-mail, in which Sokolov stated: "I'm not naive. I realize it is always possible that Shane will still contest any grades he will get this quarter if they are not what he thinks they should be, but my hope is that in the end he will come to realize that the only way he can 'win' is to accept a terminal master's, and leave without a bitter taste. In any case, if during this quarter his grades are not up to Ph.D. standards, and if he does not accept the master's degree offer, the department will have followed the due process required for notification of disqualification based on academic criteria." The passage Lachtman relies on was only one part of a lengthy e-mail outlining and clarifying the procedures to be followed to resolve the difficult issue of his academic standing. The e-mail cannot be read to reflect the subjective intent and motives of the History Department faculty members because there was no evidence Sokolov or Burt had any influence in the decision to deny Lachtman advancement to the Ph.D. program. Neither Sokolov nor Burt was a faculty member of the History Department, neither was a member of the History Department's graduate program committee, and neither was one of Lachtman's instructors. There is no evidence Sokolov or Burt communicated with Professors Davis, Bruce, or Wiener in an attempt to influence their assessments of Lachtman's writing samples.

■ Denial of Lachtman's advancement in the Ph.D. program fully comported with procedural due process. Lachtman received notice of faculty dissatisfaction of his performance in the History Department Ph.D. program from the first-year review committee, then, after his appeal, in Pomeranz's October 28, 2002 letter. That letter informed Lachtman of the requirements he had to meet to advance to the Ph.D. program in history. Three of the History Department faculty members evaluated his writing, and decision makers in the History Department made a "careful and deliberate" decision (*Horowitz, supra,* 435 U.S. at p. 85) to offer him a terminal master's degree rather than advancement to the Ph.D. program. Procedural due process was satisfied and required no more.

3.

*Substantive Due Process*

■ In deciding whether a student's substantive due process rights have been violated, we start with the "widely accepted rule of judicial nonintervention into the academic affairs of schools." (*Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803, 808 [159 Cal.Rptr. 858, 602 P.2d 778] (*Paulsen*).) " 'University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement

to promotion or graduation.' " (*Ewing, supra*, 474 U.S. at p. 225, fn. 11.) Judicial review of a university's academic decision is a "narrow avenue" restrained by "[c]onsiderations of profound importance." (*Id.* at pp. 227, 225.)

In *Ewing, supra*, 474 U.S. 214, the Supreme Court defined the scope of substantive due process review of a university's academic decisions.[3] In that case, the university's promotion and review board dismissed Ewing from a joint undergraduate-medical school program after he received a low score on a required written examination. (*Ewing, supra*, 474 U.S. at pp. 215–216.) In response to Ewing's written request, the board reconvened and allowed Ewing to appear in person to explain his low score. (*Id.* at p. 216.) After reconsidering the matter, the board reaffirmed its prior decision to dismiss Ewing from the program. (*Ibid.*) The medical school executive committee denied Ewing's appeal for a leave of absence to retake the examination, and denied his two later requests for readmission to the medical school. (*Id.* at pp. 216–217.)

The Supreme Court assumed Ewing had a protectable property right in continued enrollment, but held his dismissal did not violate his substantive due process rights. (*Ewing, supra*, 474 U.S. at p. 223.) The court explained the scope of such substantive due process review: "When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." (*Id.* at p. 225, fn. omitted.) The court reasoned the lack of substantive due process standards, the judiciary's responsibility to safeguard academic freedom, and the court's limited expertise in the area "counsel restrained judicial review of the substance of academic decisions." (*Id.* at pp. 225–226; see also *Gossett v. Board of Regents for Langston Univ., supra*, 245 F.3d at p. 1182 ["Under Supreme Court authority, a plaintiff asserting a substantive due process claim based on an academic decision must show that the decision was the product of arbitrary state action rather than a conscientious, careful and deliberate exercise of professional judgment"].)

California cases have phrased the standard for judicial review of academic decisions somewhat differently than has the United States Supreme Court. In *Paulsen, supra*, 25 Cal.3d at page 808, the California Supreme Court held a

---

[3] In *Horowitz, supra*, 435 U.S. at pages 91–92, the Supreme Court assumed that courts can review a public university's academic decision for substantive due process violations under an arbitrary and capricious standard. The Supreme Court, warning against "judicial intrusion into academic decisionmaking," concluded "no showing of arbitrariness or capriciousness has been made in this case." (*Id.* at p. 92.)

private law school did not act arbitrarily or capriciously when it imposed a no-degree condition on the readmission of an academically disqualified student. The court recognized an exception to the rule against judicial intervention in a university's academic affairs "whenever it is alleged that a university or college has acted arbitrarily or in bad faith." (*Ibid.*) Since the university granted the student a fair hearing and there was no evidence of arbitrariness or bad faith, the California Supreme Court affirmed a declaratory judgment in the university's favor. (*Id.* at pp. 809, 811.)

In *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1551 [42 Cal.Rptr.2d 110] (*Banks*), the Court of Appeal affirmed summary judgment in favor of a university, upholding its decision to dismiss the plaintiff from a teaching credential program. Citing *Paulsen*, the *Banks* court concluded a court may overturn a university's decision to dismiss a student for academic reasons only "if we find it to be arbitrary and capricious, not based upon academic criteria, *and* the result of irrelevant or discriminatory factors." (*Banks, supra*, 35 Cal.App.4th at p. 1551, italics added.) "In keeping with this highly deferential standard of review," the *Banks* court stated, "cases challenging academic dismissals often will appropriately be resolved as a matter of law on summary judgment: 'In cases involving academic dismissal, educational institutions have the right to receive summary judgment unless there is evidence from which a jury could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance.' " (*Ibid.*, quoting *Clements v. Nassau County* (2d Cir. 1987) 835 F.2d 1000, 1004.)

The decision to deny Lachtman advancement to the Ph.D. program comported with substantive due process requirements as phrased in *Ewing*, *Paulsen*, or *Banks*. The graduate program committee agreed unanimously to deny Lachtman advancement to the history Ph.D. program. The committee informed Lachtman its decision was based on "whether significant improvement had been made in your writing to compensate for the deficiencies noted in the departmental evaluation conducted at the end of your first year of graduate study." Those deficiencies included " 'serious writing problems, a narrow intellectual focus (essentially limited to the subject of race and baseball in American culture), and limited engagement with other topics that form an essential part of any program in American history.' " The three professors who evaluated Lachtman's writing samples found one sample to be "uneven" and the other to be " 'competent but fairly predictable and superficial.' " The professors concluded the writing samples did not provide " 'convincing evidence' " that Lachtman could perform "good, competent work" other than in the "narrow field of racism in baseball" and did not demonstrate improvement in his writing.

The "narrow avenue for judicial review" (*Ewing, supra,* 474 U.S. at p. 227) limits our inquiry to whether those reasons were a substantial departure from academic norms. Quality of writing and range of intellectual interest are solid academic criteria highly relevant to performance in a history Ph.D. program. The three professors who evaluated Lachtman's writing determined it was not good enough for the Ph.D. program and did not demonstrate improvement, and concluded Lachtman displayed limited interest in essential areas of American history that were outside of his narrow field of interest. Because those reasons were not a departure, substantial or otherwise, from accepted academic norms, it is immaterial whether the history professors' professional evaluation of Lachtman's writing and perception of his academic interests were correct.

Lachtman asserts the three professors who evaluated his writing— Professors Michael Davis, Dave Bruce, and Jon Wiener—were chosen in bad faith in that two did not share Lachtman's academic interests and a third (Wiener) had already advised Lachtman to leave the Ph.D. program. In a letter reporting the results of the writing evaluation to Lachtman, the chair of the History Department graduate program committee wrote: "I selected these three faculty because they are the senior members of the department in U.S. history. Bruce and Wiener have had many years experience working with graduate students; Davis is the professor with whom you have done the most work." Those reasons are neither arbitrary nor capricious and reflected professional judgment.

Davis testified in his deposition that in retrospect he could not "in good faith tell you . . . that [Lachtman] was incapable of doing Ph.D. work," he was "wrong to be so angry at [Lachtman]," and his initial, favorable impression of Lachtman was correct. Davis added: "I don't think that my conduct in the course of all this met the standards that you would expect from a tenured senior professor. At some point I wanted to wash my hands of it."

Davis's testimony does not create a triable issue of material fact as to bad faith or improper motive. Davis did not testify his evaluation of Lachtman's writing substantially departed from accepted academic norms, was inaccurate, or was made in bad faith. Davis testified he was not "blaming my colleagues" for his decision and "[t]here was no serious attempt to intimidate or threaten me." Even if Davis had supported Lachtman's advancement to the Ph.D. program, Lachtman produced no evidence that Davis would or could have persuaded Bruce or Wiener to change their assessments of Lachtman's writing, or that Davis could have changed the decision of the History Department graduate program committee.

Under the undisputed facts, the decision denying Lachtman advancement to the Ph.D. program was not "such a substantial departure from accepted

academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." (*Ewing, supra*, 474 U.S. at p. 225.) That decision therefore did not deny Lachtman substantive due process.

## II.

### CONTRACT CLAIMS

### (CAUSES OF ACTION 2, 5, 6, AND 7)

### A.

### *Graduate Student Researcher Contract*

In causes of action 2 and 5—for breach of contract and breach of the implied covenant of good faith and fair dealing—Lachtman alleged the University breached his contract for employment as a graduate student researcher by withdrawing the offer of employment on learning he was not a Ph.D. student. On appeal, Lachtman argues the University breached the contract "as it only paid [him] $880 in tuition, while the contract required that [he] receive $33,396." As a matter of law, Lachtman cannot prevail on a claim for breach of contract or breach of the implied covenant of good faith and fair dealing under either theory.

Public employment in the State of California is held by statute, not by contract. (*Miller v. State of California* (1977) 18 Cal.3d 808, 813 [135 Cal.Rptr. 386, 557 P.2d 970].) A California public employee, whether civil service or not, cannot state a cause of action for breach of contract or breach of the implied covenant of good faith and fair dealing arising out of the public employment relationship. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 23–24 [276 Cal.Rptr. 303, 801 P.2d 1054]; *Hill v. City of Long Beach* (1995) 33 Cal.App.4th 1684, 1690 [40 Cal.Rptr.2d 125].) The public employee's remedies are limited to those provided by statute or ordinance. (*Hill v. City of Long Beach, supra*, 33 Cal.App.4th at p. 1690.)

Employees of the University of California are state employees, and, therefore, hold their employment by statute, not by contract. (*Kim, supra*, 80 Cal.App.4th at p. 165.) The Regents of the University of California have rulemaking and policymaking power, and their policies and procedures have the force and effect of statute. (*Ibid.*)

Since Lachtman was an employee of the University of California, his employment was held by statute, not by contract, and his remedies for breach

were limited to those afforded by statute and the University's rules and policy. Lachtman did not bring a statutory cause of action. Indeed, he specifically alleged that "[u]nlike most contracts with public entities, [graduate student researcher] positions are not held by statute or governed by a collective bargaining agreement" but "are held exclusively by contract."

In support of the argument that graduate student researcher positions are held by contract, Lachtman relies on *Association of Graduate Student Employees v. Public Employment Relations Bd.* (1992) 6 Cal.App.4th 1133, 1135–1136 [8 Cal.Rptr.2d 275] (*Association of Graduate Student Employees*). In that case, the Public Employment Relations Board determined that graduate student researchers were not employees for the purpose of obtaining collective bargaining rights under the Higher Education Employer-Employee Relations Act (HEERA) (Gov. Code, § 3560 et seq.). (*Association of Graduate Student Employees, supra*, 6 Cal.App.4th at p. 1135.) The appellate court affirmed, upholding the Public Employment Relations Board's finding that treating graduate student researchers as employees under HEERA would not further its purposes. (6 Cal.App.4th at pp. 1144–1146.)

Contrary to Lachtman's argument, *Association of Graduate Student Employees* did not create a narrow exception for graduate student researchers to the general rule that the employment of state public employees is held by statute rather than by contract. In *Association of Graduate Student Employees*, the court held only that graduate student researchers are employees who are not entitled to collective bargaining rights under HEERA. The Court of Appeal in that case did not address whether graduate student researchers hold their employment by statute or by contract.

Nor did the Court of Appeal in *Association of Graduate Student Employees* conclude that graduate student researchers are not employees for any purpose—a proposition HEERA would not support. HEERA defines an "employee" for purposes of its reach as: "[A]ny employee of the Regents of the University of California, the Directors of the Hastings College of the Law, or the Trustees of the California State University. However, managerial and confidential employees and employees whose principal place of employment is outside the State of California at a worksite with 100 or fewer employees shall be excluded from coverage under this chapter. The board may find student employees whose employment is contingent on their status as students are employees only if the services they provide are unrelated to their educational objectives, or that those educational objectives are subordinate to the services they perform and that coverage under this chapter would further the purposes of this chapter." (Gov. Code, § 3562, subd. (e).) Under that definition, a student employee, such as a graduate student researcher, can be a public employee yet not be an employee within the meaning of, and subject

to, HEERA. Thus, whether a graduate student researcher is an employee for the purpose of determining collective bargaining rights, the issue resolved in *Association of Graduate Student Employees*, is not relevant to whether a graduate student researcher can state a cause of action for breach of contract.

B.

*Diversity Fellowship*

In causes of action 6 and 7, Lachtman alleged the University breached a contract for a diversity fellowship, and breached the implied covenant of good faith and fair dealing with regard to that contract. He claimed the University breached the contract not only by failing to pay his stipend after he received his master's degree, but also by failing to pay his stipend during his second academic year, when he was still a graduate student in good standing. We conclude the University failed to meet its summary adjudication burden on causes of action 6 and 7.

Lachtman received a diversity fellowship totaling $40,000. According to the offer letter, Lachtman was to receive a stipend of $10,000 from "Graduate Division Funding" plus "All Fees paid" during the 2001–2002 academic year. For the following three academic years (2002–2005), he was to receive a total of $30,000 from "Department Funding," described in the offer letter as "2-qtr TAship 50% + Partial Fees." The offer letter refers to "[f]ellowship guidelines and procedures that pertain to [the] award," but that document is not included in the record. The offer letter states: "Fellowship holders must remain in good academic standing during the tenure of the award."

The University argues the diversity fellowship did not create a contractual relationship, but if it did, the contract was fully performed. No California case addresses whether an academic fellowship is a contract. In one case, a New York court concluded "the granting of a scholarship or fellowship is not contractual in nature." (*Ewing v. State of New York* (N.Y.Ct.Cl. 1972) 69 Misc.2d 923, 924 [331 N.Y.S.2d 287].) In some cases, courts have accepted athletic scholarships as creating a contractual relationship. (E.g., *Begley v. Corporation of Mercer University* (E.D.Tenn. 1973) 367 F.Supp. 908, 910.)

Here, the University failed to meet its burden of making a prima facie showing Lachtman's diversity fellowship did not create a contractual relationship. We have reviewed the diversity fellowship offer, the fellowship acceptance form signed by Lachtman, and the Handbook provisions pertaining to fellowships. We cannot say, as a matter of law, whether or not these documents create a contractual relationship.

The University also failed to meet its burden of showing the terms of the diversity fellowship were performed. It is undisputed the University paid Lachtman nothing from the diversity fellowship after May 31, 2002, the end of his first academic year in the History Department's graduate program. It is also undisputed Lachtman was not on academic probation during his second academic year in the History Department's graduate program. Although Lachtman would not have been entitled to receive fellowship money after graduating with a master's degree, the University failed to show he was not entitled to receive fellowship money during his second academic year.

The acceptance form states the diversity fellowship for the second, third, and fourth academic years would be funded, at least in part, from Lachtman serving as a teaching assistant. The University does not argue the diversity fellowship thus created an employment relationship subject to university grievance procedures, nor does the University argue Lachtman failed to satisfy the teaching assistant requirement.

## III.

### VIOLATION OF PRIVACY RIGHTS

### (CAUSE OF ACTION 1)

Lachtman argues the trial court erred by ruling against him on his claim for violation of privacy rights under the California Constitution and the Information Practices Act of 1977 (IPA) (Civ. Code, § 1798 et seq.).[4] In cause of action 1, Lachtman alleged his privacy rights were violated when (1) persons in the History Department disclosed his personal information to staff members in other departments at UCI and at UCLA; (2) a UCI administrator informed a member of the graduate program committee that Lachtman had spoken to her about problems in the History Department; (3) the graduate program committee member wrote a letter, which was distributed to other

---

[4] In his third amended complaint, Lachtman asserted a violation of a privacy right under the United States Constitution. He does not address a federal constitutional claim in his appellate briefs, and therefore we deem the issue waived. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 240 [26 Cal.Rptr.3d 798].)

In his opening brief, Lachtman argues the confidentiality of his student records was protected by Education Code section 76200 et seq. and by the Family Educational Rights and Privacy Act of 1974 (20 U.S.C. § 1232g). Lachtman never asserted a claim under the Education Code and, in the separate statement filed in opposition to the University's motion for summary judgment, stated he did not intend to pursue any claim under the Family Educational Rights and Privacy Act of 1974. In any event, the Family Educational Rights and Privacy Act of 1974 does not create a private right of action for improper disclosure of student records. (*Gonzaga Univ. v. Doe* (2002) 536 U.S. 273, 287 [153 L.Ed.2d 309, 122 S.Ct. 2268].)

faculty in the History Department and placed in Lachtman's file, regarding her conversation with the UCI administrator; (4) Lachtman's records were not maintained accurately or completely; and (5) Lachtman was not given access to his complete files.

## A.

## *IPA*

The IPA prohibits a state agency from disclosing personal information (Civ. Code, § 1798.3), except if "the disclosure is relevant and necessary in the ordinary course of the performance of . . . official duties and is related to the purpose for which the information was acquired" (*id.*, § 1798.24, subd. (d)). The IPA creates a private right of action if the state agency's failure to maintain the plaintiff's personal information has an "adverse effect" on him or her. (*Id.*, § 1798.45, subd. (c).)

The University argues student records are exempt from the IPA, pursuant to Civil Code section 1798.74, which provides: "The provisions of Chapter 13 (commencing with Section 67110) of Part 40 of the Education Code shall, with regard to student records, prevail over the provisions of this chapter." Chapter 13 applied to postsecondary education. Education Code section 67110 was repealed in 1995. The University argues the repeal is irrelevant because the Legislature nonetheless intended the IPA not apply to student records. The flaw in this argument is the Legislature did not state the IPA was inapplicable to student records; instead, the Legislature stated the provisions of chapter 13 of the Education Code "prevail" over the IPA.

This conclusion begs the question, however, whether the University of California is an agency within the meaning of the IPA. The IPA defines "agency" to mean "every state office, officer, department, division, bureau, board, commission, or other state agency" except for the California Legislature, and any agency established under California Constitution, article VI, the State Compensation Insurance Fund, and local agencies. (Civ. Code, § 1798.3, subd. (b).) The California Constitution establishes the University of California as a "public trust . . . with full powers of organization and government." (Cal. Const., art. IX, § 9, subd. (a).) The California Supreme Court has observed that " 'Article IX, section 9, grants the [R]egents broad powers to organize and govern the university and limits the Legislature's power to regulate either the university or the [R]egents. This contrasts with the comprehensive power of regulation the Legislature possesses over other state agencies.' " (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 [25 Cal.Rptr.3d 320, 106 P.3d 976].)

The University of California has adopted policies applying to disclosure of information from student records (the UC Disclosure Policies). Section 130.11 of the UC Disclosure Policies states their purpose is "to provide reasonable interpretations of the Federal Family Educational Rights and Privacy Act and to protect the student's right of privacy as guaranteed by the Constitution of the State of California and the Information Practices Act." Accordingly, the UC Disclosure Policies state, "[w]hen the law is silent, the campuses shall be guided by two principles: (1) the privacy of an individual is of great weight, and (2) the information in a student's file should be disclosed to the student on request." Do these policies reflect a recognition the University of California is an agency under the IPA, or do they reflect a desire to provide privacy protection otherwise lacking because the University of California is not an agency under the IPA?

We need not decide whether the University of California is an agency under the IPA, or whether the IPA applies to University of California student records via the UC Disclosure Policies. Even if the IPA applied to Lachtman's student records, the University met its burden of establishing the disclosure of Lachtman's personal information was relevant and necessary. The University established that communication between the History Department and the professor with whom Lachtman would have been working as a graduate student researcher was relevant and necessary before he could begin that assignment. Communication between the History Department and faculty at UCLA and faculty in other departments at UCI from whom Lachtman was receiving instruction was relevant and necessary to make decisions about Lachtman's continuation as a Ph.D. student. Additionally, it was necessary for a university administrator to communicate Lachtman's complaints about the History Department to department faculty members.

In addition, an essential element of a claim under the IPA is proof that as a proximate result of the agency's failure to comply with the IPA there was an "adverse effect" on the plaintiff. (Civ. Code, § 1798.45, subd. (c); *Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437, 446 [78 Cal.Rptr.2d 913].) Lachtman failed to rebut the University's showing that any purported disclosure of his student records to other students had an adverse effect on him. In opposition to the motion for summary judgment, Lachtman submitted a copy of an e-mail he claims was sent to other UCI students about his grades and other academic matters. Lachtman has not identified the recipients of the e-mail and therefore has failed to show the e-mail was sent to anybody who did not have the right to see it. Moreover, the personal information conveyed in this e-mail was limited, and Lachtman fails to identify what, if any, harm he suffered as a result of its purported distribution.

Regarding the alleged inaccurate and incomplete records, there are discrepancies between the versions of Lachtman's academic transcript submitted by

the parties. The transcript submitted by the University reflects a grade of B+ in one fall quarter 2001 history class, while the transcript submitted by Lachtman reflects a grade of A- in that class. In addition, the University's transcript shows Lachtman received an "I" in a sociology class in the winter 2003 quarter, while Lachtman's copy of the transcript shows he received an A- in that course. Lachtman, however, offered no evidence showing which transcript was correct and did not show how any inaccuracy in the transcripts affected his status in the Ph.D. program.

Lachtman also failed to show that any inaccuracies in his student records caused him to lose his position as a graduate student researcher. Lachtman did provide evidence his file incorrectly reflected he was not a full-time graduate student and had not paid his fees for the fall 2002 quarter. However, the University provided evidence Professor David Goldberg, who offered Lachtman the job as a graduate student researcher, did not rely on the information in Lachtman's file in subsequently withdrawing that offer. Since Lachtman's graduate student researcher position was reinstated, and he held the position to the termination date, inaccuracies in his student record could not have caused him to lose the researcher position.

## B.

### *Constitutional Violation of Privacy*

■  Article I, section 1 of the California Constitution establishes the state constitutional right to privacy. The "principal 'mischiefs' " it intends to prevent are: "(1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records." (*White v. Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].) It is the last two of these "mischiefs" of which Lachtman argues he was the victim.

A plaintiff alleging a violation of a privacy interest under the California Constitution must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) conduct by the defendant constituting a serious invasion of that privacy interest. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39–40 [26 Cal.Rptr.2d 834, 865 P.2d 633].) A defendant challenging the privacy claim may do so either by negating one of the three elements or by proving the invasion of privacy is justified "because it substantively furthers one or more countervailing interests." (*Id.* at p. 40.) If the defendant establishes that defense, the plaintiff may rebut it by

"showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." (*Ibid.*)

The University met its burden of proof by establishing either that Lachtman did not suffer a serious invasion of privacy, or that any such invasion of privacy was justified. As discussed *ante*, members of the History Department faculty were justified in communicating with faculty in other departments and at other University of California campuses to properly consider Lachtman's candidacy in the Ph.D. program. To the extent Lachtman's personal information was shared with other students or other faculty or staff members, the limited nature of the information is such that it was not a serious invasion of privacy. Lachtman did not offer evidence rebutting the University's evidence in this regard. The trial court properly granted the motion for summary judgment with respect to the first cause of action.

## IV.

### FREE SPEECH RIGHTS/RETALIATION

### (CAUSE OF ACTION 8)

In cause of action 8, Lachtman alleged his expression of opinion in Professor Block's class that a reading assignment was anti-Semitic cost him his graduate student researcher position and resulted in the termination of his Ph.D. candidacy. (Lachtman also alleged the retaliation against his expression of opinion in Block's class resulted in the denial of his due process rights. This argument has been addressed, *ante*, in pt. I.)[5]

A claim for retaliation for engaging in protected speech under the First Amendment requires proof that (1) the person was subjected to an adverse action; (2) the person had engaged in speech that was constitutionally protected because it touched on a matter of public concern; and (3) the protected speech was a substantial motivating factor for the adverse action. (*Ulrich v. City and County of San Francisco* (9th Cir. 2002) 308 F.3d 968, 976.) We do not address the first two elements of Lachtman's retaliation claim because, we conclude, Lachtman's statements made in Block's class were not a substantial motivating factor in the decision to deny him advancement in the history Ph.D. program.

Lachtman alleged in his third amended complaint that, in retaliation for his comments in Professor Block's class, he was denied advancement to the

[5] In his opening brief, Lachtman argues he also had a protected First Amendment right in "petitioning to drop Block's course . . . which is in fact speaking out against her to her colleagues." In contrast, Lachtman alleged in his third amended complaint only that his opinions and speech expressed in the course were protected.

Ph.D. program and his graduate student researcher position was withdrawn. Lachtman enrolled in Block's course for the fall quarter of 2001 and dropped the course after attending two class sessions. The University offered uncontradicted evidence that there was no direct retaliation as a result of Lachtman's comments: Lachtman dropped the course with no adverse effect on his grade and successfully petitioned to take a comparable course at UCLA. Lachtman failed to offer any evidence that his comments in Block's course were a substantial motivating factor, or any factor, for denying his advancement to the Ph.D. program eight or nine months after he dropped the course.

No evidence was presented of any connection between Lachtman's disagreement with Professor Block and Lachtman's temporary loss of the graduate student researcher position over a year later. Professor Goldberg, who made and withdrew and then reinstated the offer of the graduate student researcher job to Lachtman, was not aware of Lachtman's comments in Block's class from a year earlier. Goldberg testified in his deposition he withdrew the offer of the researcher position because "according to the records to which we were privy through the UC system to which we had access for, he seemed at the time not to be a full-time graduate student[] in the University of California." Goldberg testified he then contacted Pomeranz and was told Lachtman was not a student in good standing and "there was some difficulty regarding his status in the department." Nevertheless, Goldberg reinstated Lachtman to the graduate student researcher position in November 2002.

### DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to (1) vacate its order granting summary judgment, and (2) enter an order granting summary adjudication as to the first, second, third, fourth, fifth, and eighth causes of action and denying summary adjudication as to the sixth and seventh causes of action. In the interests of justice, and because both parties prevailed in part, each party shall bear his or its own costs on appeal.

Aronson, J., concurred.

**O'LEARY, Acting P. J.,** Concurring and Dissenting.—Citing *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*), the majority sets forth the principles of summary judgment review. I agree with these well-settled principles. I also note the Supreme Court in *Aguilar* instructs us to consider the evidence and inferences reasonably drawn from the evidence in the light most favorable to the party opposing the

motion. (*Id.* at p. 843.) It is well established that when reviewing a summary judgment motion, "the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact." (*Id.* at p. 856.) But, the court "must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.*" (*Ibid.*)

These rules implicitly recognize that reasonable triers of fact often can read the evidence differently and draw different inferences. As I will explain anon, I conclude from the record before us that Shane Lachtman established disputed issues of material facts as to his claims regarding due process (fourth cause of action). I concur in the majority's reversal of the summary adjudication of the sixth and seventh causes of action regarding the fellowship award. I would affirm the summary adjudication of the remaining causes of action.

With respect to the due process claim, the majority summarily states the evidence regarding Lachtman's dismissal from the Ph.D. program as follows: "After his first year, Lachtman was informed of deficiencies in his academic performance and of certain requirements, including improvement in his writing, he needed to meet to advance to the Ph.D. program. In February 2003, three professors in the History Department evaluated Lachtman's writing, determined it had not improved and was not good enough for the Ph.D. program, and concluded Lachtman displayed limited interest in essential areas outside of his narrow field of academic interest. As a result, the History Department denied . . . Lachtman advancement to the department's Ph.D. program, and he ultimately received a master's degree." (Maj. opn., *ante,* at p. 191.) Upon these facts, the majority concludes, "the University satisfied procedural due process by informing Lachtman of the deficiencies of his performance and the consequences they posed to his advancement, and by making a considered, deliberate decision." (*Id.* at p. 201.)

Based on the majority's recitation of the facts, its conclusion the University of California, Irvine's (University) dismissal of Lachtman comported with due process requirements is not unreasonable. However, the facts I glean from the record are not so straightforward. I conclude Lachtman established the existence of triable issues of material facts, and I would reverse the trial court's order granting summary judgment as it pertains to the due process cause of action.

It is important to recognize from the outset that Lachtman was subjected to two separate evaluations. The first evaluation occurred at the end of Lachtman's first year. Lachtman received a June 2002 letter stating his academic progress was unsatisfactory and notifying him it was recommended he not continue in

the graduate program. He was provided no specifics as to deficiencies and no opportunity to improve. The letter was from the chair of the history department (History Department), Kenneth Pomeranz, and stated, "The faculty members who taught you in courses during 2001–2002 in the History Department met this week to conduct our review of your academic performance during your first year. Based on our overall assessment of your performance in your first-year classes, we see little prospect of [you] successfully completing the doctoral program, and thus we do not recommend your continuation in the program."

As the majority indicates, "Lachtman disputed the first-year review committee's decision." (Maj. opn., *ante,* at p. 202.) They characterize his argument as being focused on the "factual dispute over who served on the first-year review committee, arguing professors holding favorable opinions of him were excluded from it." (*Ibid.*) The majority concludes this factual dispute, if real, is immaterial because the History Department granted Lachtman an opportunity after his first-year review to advance to the Ph.D. program by fulfilling certain requirements.

Unlike the majority, I view the disputes regarding the first-year review to be an integral part of the due process analysis and the facts involved in that dispute material to the ultimate decision as to whether Lachtman was afforded due process before his termination from the Ph.D. program. Lachtman's dispute with the first-year review is more complex than being about *who* participated in the review.

Lachtman asserts it was a written complaint he lodged against one of his first-year professors that was the *real* impetus for his dismissal, not poor academic performance. The composition of the first-year committee denied him a fair review and the committee was preordained to dismiss him for reasons unrelated to his academic performance. It is reasonable to infer that if, in fact, the first-year review resulted from *animus* against Lachtman rather than an honest and objective assessment of his performance, or violated his due process rights for other reasons, he was then unfairly subjected to further critical review. Rather than eradicating any errors in the first review, improperly subjecting Lachtman to a second review would only have compounded the problems from the first review and given greater credence to Lachtman's claim he was wrongly dismissed. Thus, while some may view any deficiencies in the first-year review as immaterial to the due process claim, I conclude a reasonable trier of fact may agree with Lachtman's assertion it was merely the starting point for his due process claim.

Lachtman argues his problems with the History Department, and dismissal from the program, all stem from a clash he had with Professor Sharon Block.

He asserts the criticism he leveled against Block (while attempting to substitute her class with another) ruined his reputation among the History Department's faculty and was the actual basis for his dismissal. If the facts were found to be as Lachtman portrays them, a reasonable trier of fact could conclude Lachtman's ultimate exclusion from the Ph.D. program was the result of bad faith and not the result of a careful and deliberate examination of his graduate work.

There is no dispute Lachtman enrolled in a required course taught by Block during his first quarter at the University, or that he only attended two class sessions before dropping it. After dropping the class, Lachtman petitioned to substitute a class in the place of the dropped class. In his petition, Lachtman explained his request "is necessitated by the unfortunate and irreparable damage done to the faculty-student relationship between . . . Block and me, which forced me to drop the class in Fall 2001." He claimed the damage occurred "because during a meeting . . . Block expressed negative opinions about me as a person that were unrelated to academic criticism or feedback." He opined, "important professional boundaries had been dramatically violated." Lachtman stated he respected Block's right to privacy and, therefore, he would "not present[] specific statements, facts, occurrences, conversations, etc., however important, because . . . Block is not formally included in this process." Lachtman filed his inflammatory petition criticizing Block on March 30, 2002, approximately two months before receiving his first-year review in early June.

This petition was reviewed by the graduate program committee (GPC), which was comprised of three History Department faculty members: Jon Wiener, Dickson Bruce, and Carolyn Boyd. Immediately after filing his petition, Lachtman claims he experienced retaliation from Block's colleagues. First, Boyd wrote a letter on behalf of the GPC, chastising Lachtman for the contents of his petition and calling into question his personal ethics. She told Lachtman the GPC could not consider his petition, and he must resubmit one to (1) "state clearly the reasons for an exemption from departmental requirements"; (2) remove references to the sexual harassment portion of the University's policies and procedures unless he is charging Block with sexual harassment; and (3) state which course he proposes to substitute for the required course. Boyd concluded by stating Carol Sokolov, in the office of research and graduate studies, had indicated Lachtman had complained the GPC had denied his petition "when in fact [he] had not yet even submitted a petition . . . . Please make an effort, as you rewrite your petition, to be as truthful and as accurate in your statements as possible, and please observe the established departmental procedures for handling student requests." Lachtman read this to mean the GPC members thought he was lying.

At the time he filed his petition, Lachtman was taking a class from Wiener. He asserts that within a few days after filing the petition, he experienced retaliation from Wiener. Lachtman indicates Wiener told him to leave the program because his interests and passions were too narrow for the program. Wiener explained Lachtman's interest was racism in baseball and he had not "shown much interest in the broader concerns of our program. So I told him it would be better for him to transfer to another University that had a . . . sociology program in sports or history of sports program[s]."

Lachtman claims Wiener's comment suggesting his interests were too narrow surprised him because it was the first time he had heard this criticism. Lachtman claims he had not yet chosen a thesis topic or specific area of scholarship because normally this is not done until the third year of graduate school. Moreover, Wiener had previously approved Lachtman's baseball/race writing focus in his own courses and for Lachtman's admission to the History Department's graduate program.

Wiener admitted in his deposition that he urged Lachtman to leave the program, and offered to help him apply, "not because he lacked ability but because . . . there were other programs where he could thrive and that would appreciate him." Wiener also admitted in his deposition that Lachtman's petition criticizing Block affected his evaluation of him. He thought Lachtman's "reasoning was very unclear, his reference to right of privacy and his invocation of sexual harassment language seemed wrong and inappropriate to me." Lachtman points out Wiener served on every committee that evaluated him in the months to come, and voted against him every time.

There is a factual dispute as to whether Block participated in Lachtman's first-year review. Both Davis and Wiener testified Block actively participated on the first-year review committee. Wiener recalled Block telling everyone Lachtman's "work was not adequate and he should not continue in the program." The University indicated in discovery responses that Block did not participate in any way. It is undisputed Lachtman brutally criticized Block in his petition to substitute her class. And, it is also undisputed Block was Lachtman's instructor for only a very limited period of time, only three hours before he dropped her course. The participation of Block is a material fact because a determination Block took part in the review would be relevant and probative on the issue of the History Department's alleged bad faith.

In addition to questions surrounding Block's participation, the parties do not agree on whether Pomeranz, Mike Davis, Yong Chen, or some of the other professors who taught Lachtman were involved in the decisionmaking process. The inclusion or exclusion of certain faculty members is material because it bears directly on the University's intent. Did the first-year review

comport with accepted academic norms? If the deck was stacked against Lachtman because of his nasty attack on Block, a reasonable person would not find the decision to be a conscientious, careful, and deliberate exercise of professional judgment.

Lachtman maintains the review should have been conducted by all the faculty members who had taught him during the year and the most weight should have been given to the opinions of professors who shared his interests (Professors Davis and Chen). Pomeranz, in his deposition, agreed that usually the review is attended by "everybody who has taught the student." Wiener concurred, "It's a standard procedure that everybody who taught a student would be scheduled to participate in the evaluation of that student."

Wiener testified Davis was a part of the first-year review committee. Davis, however, testified he played no part in that committee's decisionmaking. Davis remembered being called in by the first-year review committee to give it his impression of Lachtman. Davis recounted, "I said something to the effect that maybe he just—you know, there was unfortunate chemistry in the choice of who he was working with. . . . I told my colleagues I thought we probably could work well together." Davis stated he was "then confronted by it seemed to be overwhelming opinion from the other faculty about [Lachtman's] performance . . . in their seminars. And these are situations very different from the guided research he was doing with me." Davis had two classes (both entitled "Directed Readings") with Lachtman and gave him two "A" grades (spring 2002 and fall 2002). It is also unclear whether Chen was part of the first-year review committee. Wiener recalled he was part of the meeting, but did not remember how he voted. Lachtman argued Chen was excluded.

Two material issues arise out of the dispute as to whether Davis and Chen were included in the first-year review committee. Did the University depart from its usual practice of including everybody who had taught Lachtman in the review? Were professors holding a favorable opinion of Lachtman's academic progress excluded from the committee? Both determinations are material in determining whether the procedures used to dismiss Lachtman departed from accepted academic norms. If Chen was excluded it would be evidence of a substantial departure from the academic norm because Chen was slated to be Lachtman's adviser.

Whether Pomeranz served on the first-year review committee was also disputed. Davis recalled he was there. But, Pomeranz stated in his deposition he did not teach Lachtman during the first year of study and he was not part of the review. This dispute is material because the inclusion of faculty who had no personal knowledge of the student's performance would be outside the normal practice of the University as described by Wiener.

In addition to the uncertainty of the committee's makeup, there are significant questions regarding the criteria utilized in conducting the review. For example, Lachtman's evidence concerning Professor Alice Fahs's involvement on the first-year review committee supports a reasonable inference Lachtman was really disqualified for nonacademic reasons. It is undisputed Professor Fahs participated in the first-year review. Fahs gave Lachtman an "A-" in History 260C, but Wiener recalled, "I think after hearing the opinions—the judgments, the evaluations, of the other faculty members, [Fahs] was part of the consensus that he hadn't performed the required level and, therefore, he should not be advanced in the program." The grade Fahs gave Lachtman and her previous written evaluation of his work raise a question as to whether Fahs exercised her professional judgment or was pressured into agreeing Lachtman should be dismissed. Fahs's written evaluation did not reflect the opinion Lachtman should not continue. She commended Lachtman "for improvement of his essays (seven in all) over the quarter. While his first essay was not focused enough and he received a 'B,' he quickly improved his essays to the point of receiving the grade of 'A-' on most of them." She also indicated there were areas for improvement, stating Lachtman could "open up his analysis" and speak more often in class. Fahs noted, "The contributions [he] did make to class were always of interest." These facts raise the question of whether the committee exercised professional judgment or was predetermined to fail Lachtman.

Lachtman's school transcript shows he took a total of nine courses before the first-year review. Wiener taught two of the courses, but that likely left seven professors who taught Lachtman and should have participated in the first-year review. The record contains written evaluations from Professors Mark Poster, "D. Bruce," and "Tinsman." The written opinions were positive about Lachtman's analysis and research skills, and all commented he had improved, and should continue to work on his writing skills. There was no suggestion he was academically unfit for the Ph.D. graduate program. The record does not reflect if any of these professors participated in the first-year review committee's final decision. If professors holding positive views of Lachtman's work were intentionally excluded from the first-year review committee, any reasonable person would question the fairness of the process.

I recognize it is not for this court to decide what constitutes acceptable graduate writing skills, or the appropriate level of class engagement by a student, because a court cannot substitute its judgment for a university's judgment on academic matters. (See *Regents of University of Michigan v. Ewing* (1985) 474 U.S. 214, 225 [88 L.Ed.2d 523, 106 S.Ct. 507]; *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1551 [42 Cal.Rptr.2d 110].) But, this court can decide if triable issues of fact exist as to whether

Lachtman's dismissal was the result of professional judgment by the University, whether the procedures employed substantially departed from academic norms, and whether the dismissal was prompted by an impermissible motivation.

Turning now to the "second chance" Lachtman was given, the majority summarizes the record by stating the History Department presented their terms for reconsidering Lachtman for the Ph.D. program in a letter dated October 2002, after Lachtman's "appeal." (Maj. opn., *ante,* at p. 203.) They conclude the procedural due process elements were satisfied because that letter "informed" Lachtman of the requirements he had to meet to advance to the Ph.D. program, and because faculty from the History Department "evaluated" Lachtman's writing before reaffirming his termination from the program. (*Ibid.*) The majority also concludes there was no evidence Lachtman's substantive due process rights were violated because the History Department's faculty cited valid academic reasons for its decision.

Lachtman claimed the History Department's offer to give him a second chance was in fact illusory. He was given only one additional quarter to make up alleged academic deficiencies, and the History Department imposed impermissibly high and arbitrary standards for him to meet. Lachtman maintains there is evidence the faculty utilized arbitrary, coercive, and bad faith tactics to intimidate and coerce him to discontinue the program and accept a terminal master's degree. Applying our standard of review, and resolving all evidentiary doubts and credibility determinations in favor of Lachtman, I conclude a reasonable trier of fact could find for Lachtman on these claims.

To begin with, I found Lachtman presented evidence reasonably suggesting flaws in the dismissal process utilized by the History Department that could establish a due process violation. Lachtman alleges the procedures followed in his dismissal did not conform to those established by the University. But, because those procedures are lengthy and involved, I highlight only a few aspects of the procedures.

It was undisputed Lachtman's "second chance" to remain in the program came after he involved the University's ombudsman. Arguably, the History Department's agreement to give Lachtman a do-over was precipitated, in whole or in part, by the intervention of the ombudsman. In a September 15, 2002 e-mail the ombudsman posed a number of specific questions to Pomeranz, "meant to revisit the decision in the interest of procedural fairness [regarding] first-year review and not the substance of the discussion leading to the outcome during the first-year review." Essentially, the ombudsman made clear he was questioning the process, and was not attempting to

second-guess the academic decisions of the faculty. Many of the questions were focused on whether students were being given adequate notice of what was expected, and given the earliest possible notice of deficiencies. In his reply e-mail, Pomeranz indicated he felt there was nothing wrong with the process, but conceded posting the required higher history graduate grade point average on the Web site was a good idea. He also admitted that although quarterly progress reports were required from the student's professors, they were not always timely submitted. He concluded by stating that if Lachtman "wants to ask GPC to reconsider, that's out of my hands. I doubt he would persuade them, but he's certainly free to try."

In October 2002, the matter apparently landed back in Pomeranz's hands when he wrote Lachtman the letter outlining the terms under which he could seek to be readmitted to the graduate history program. Lachtman included in the record various e-mails between University administration members and faculty members regarding the Lachtman dismissal. These e-mails are susceptible to various interpretations. Lachtman would argue they were conspiratorial discussions about how to ensure his final dismissal. The University would argue they simply represent an effort to provide Lachtman with due process.

Of significance to Lachtman's claims are comments in an October 20 e-mail from Pomeranz regarding an upcoming meeting. He stated, "Here's another piece of business we need to discuss—it turns out that the procedure we've been using to handle removing students from the program since god-knows-when (certainly before I came here in '88) is not what RGS [Office of Research and Graduate Studies] wants to see—so we'll have to go through some additional hoops with respect to Shane." Arguably, these comments are consistent with Lachtman's claim his second chance was nothing more than the faculty going through the motions to appease the administration, and was never intended to be a good faith review.

Lachtman presented evidence from which it can reasonably be inferred some of the faculty members were not pleased their decision was overturned. Lachtman asserted he discovered the entire History Department had essentially turned against him when he returned to school for the second year, including his previously strongest supporter, Davis.

For example, in October 2002, Lachtman learned during a telephone conversation with Professor Ellen Burt, associate dean of humanities graduate studies, that he should leave the University because by going back into the graduate program, he would "then be faced with a faculty who [he] alienated." She explained the faculty would be angry, and "would not be appreciative if their opinions [were] reversed." Lachtman claims Burt told him to "go find something else" and "get out of Irvine," because he would lose time

fighting his case with the department. She also said, "The [history] department will be engaged in the process, however slowly."

The History Department selected only three faculty members to decide Lachtman's fate: Professors Wiener, Bruce, and Davis. The University maintains these three professors were chosen because they were the professors most likely to work with Lachtman. But, Lachtman argues these were professors who were already biased against him and would be unable to fairly evaluate his writing. Wiener had already told Lachtman he should leave the program, and neither he nor Bruce shared Lachtman's academic interests or were going to work with him. Wiener and Bruce had a history with Lachtman dating back to their review of Lachtman's class substitution petition in which he made disparaging remarks about Block.

Davis was not a colonial historian like Lachtman and, more importantly, was angry at him for causing so much trouble in the History Department. Davis recounted he told Lachtman people in the department were talking about him, explaining, "There was a kind of office gossip about him, a depiction of him being kind of a perpetual annoyance. He was seen as litigious and annoying to some people in the office."

Davis testified in his deposition in hindsight it "was probably wrong to be so angry at [Lachtman.]" He added, "I don't think that my conduct in the course of all this met the standards that you would expect from a tenured senior professor. At some point I wanted to wash my hands of it. . . ." He also admitted, "[I]n retrospect . . . I cannot in good faith tell you—I cannot honestly tell you that the student was incapable of doing Ph.D. work. I think he was. And I'm sorry that I didn't retain the courage of my earlier convictions . . . ."

Facts related to the motivation for the selection of the "second chance" review committee and any bias on the part of those members are relevant to prove the second review was not a fair hearing, raise considerable doubt about the fairness of the first-year review, and if it departed substantially from accepted academic norms. Moreover, the fact the University clearly points out Lachtman was involved in an appellate process indicates how inextricably the second-review process was linked to the first-year review.

I end as I began, with a restatement of our rules of review. In performing our independent review, it is well-settled law we view the evidence in a light most favorable to the losing party, liberally construing their evidentiary submission while strictly scrutinizing the moving party's showing and resolve any evidentiary doubts or ambiguities in the losing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617,

23 P.3d 1143].) We must resolve doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].) The parties' factual disputes relating to the propriety of Lachtman's dismissal are numerous. Because they bear on the fundamental fairness of the process, they are material on the issue of due process. The resolution of those disputes requires credibility determinations, the drawing of inferences, and the weighing of evidence—all tasks we are precluded from performing. Considering the evidence and inferences reasonably drawn from the evidence, in the light most favorable to Lachtman, I find summary adjudication on the due process claim was erroneously granted.