Filed 12/23/22  Schmeder v. The Regents of the U. of Cal. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MAXIMILLIAN SCHMEDER,<br><br>    Plaintiff and Appellant,<br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A162858<br><br>(Alameda County<br>Super. Ct. No. RG19024354) |

Plaintiff Maximillian Schmeder appeals from a judgment in favor of defendant Regents of the University of California (the University) in his action for mandamus relief following his dismissal from the University of California, Berkeley's (UC Berkeley) doctoral program.  Schmeder argues the University violated its own policies, due process, and his common law right to a fair hearing for a host of reasons, including the lack of sufficient notice of, and an opportunity to correct, his academic deficiencies; the use of improper procedures in the administrative appeal proceedings; and the bad faith motivations behind the decision to dismiss him.  Schmeder also challenges the trial court's rulings on his motions to strike and augment the administrative record.  We conclude that none of these arguments has merit,

1

and we affirm.

## BACKGROUND

In 2014, Schmeder began pursuing his Ph.D. in the history of science at UC Berkeley. UC Berkeley requires its departments to set a normative time to degree, meaning the number of semesters in which students should complete the requirements for a doctorate. The History Department anticipates it will take six years to achieve a Ph.D. in the history of science.[1]

The Ph.D. program generally consists of three stages: (1) the "pre-candidacy" stage, focusing on intensive coursework and training in research, scholarship, and professional practice; (2) the "post-candidacy" stage, where the student applies pre-candidacy work toward the completion of final degree requirements; and (3) the "final demonstration," where the student submits a final dissertation that is professionally judged by faculty. The transition from pre-candidacy to post-candidacy is referred to as " 'advancement to candidacy' for the degree." To remain on normative time, students are expected to advance to candidacy by June 30 of the spring semester of their third year, or, in Schmeder's case, June 30, 2017.

In the History Department, a student advances to candidacy only if he or she passes an oral qualifying examination ("qualifying exam" or "QE"), assembles a dissertation committee consisting of at least two History faculty and one non-History faculty, and obtains that committee's approval of a dissertation prospectus. The "prospectus should describe the issue or problem the dissertation will address and will include a discussion of relevant historiography, a description of the sources and methods to be used, and a

---

[1] Normative time may be extended in certain circumstances, subject to support from the History Department and approval of the Dean of the Graduate Division.

2

plan of action for researching." The failure to advance to candidacy within normative time "has serious consequences, including loss of departmental and University aid."

Schmeder's anticipated dissertation sought to study the intersection of science and music theory in eighteenth-century England. He was assigned a faculty advisor, Professor Massimo Mazzotti, a history of science professor. Professor Thomas Laqueur in the History Department and Professor James Davies in the Music Department agreed to serve as faculty readers, who would review and provide recommendations on Schmeder's prospectus.

On November 30, 2016, in the fall semester of his third year, Schmeder took his qualifying exam. He failed one portion of it, but passed the others. Schmeder was required to retake the exam, which was scheduled for May 9, 2017. As a result of Schmeder's failure to complete the qualifying exam, he fell out of normative time.

Meanwhile, throughout the 2016–2017 academic year, Schmeder worked on his prospectus, consulting with, and receiving verbal and written feedback on his drafts from, Mazzotti, Davies, and Laqueur, as well as Professor Jonathan Sheehan of the History Department. While Schmeder disputes the extent of Mazzotti's feedback, he does not dispute that the feedback from Davies, Laqueur, and Sheehan identified a number of substantive problems with the drafts of his prospectus.

On May 9, 2017, Schmeder sat for his second qualifying exam, which was conducted by a committee consisting of Mazzotti and several other faculty (sometimes referred to as "qualifying exam committee"). Schmeder successfully completed the exam.

According to Mazzotti, after the committee voted to pass him, it "discussed informally the future of Schmeder's research." During this

discussion, Mazzotti "learned that colleagues with whom Schmeder was supposed to have interacted closely for months had hardly seen him, and that their feedback had not been taken on.  They harbored serious concerns about the music theory side of his project, to the point that it was not even clear that the notion of modulation he was interested in could be constructed as a meaningful historical object.  Considering that Schmeder was resisting framing his project as a recognizable history of science project, it was obvious that his prospectus needed major revisions, and that this task would require working closely with various faculty members.  It could not be reasonably expected that he could advance to candidacy by 30 June 2017."

The qualifying exam committee then consulted with James Vernon, the History Department's Vice Chair for Graduate Affairs and Director of Graduate Studies, about the status of Schmeder's research.  Following that consultation, on June 6, Vernon emailed Schmeder, apparently in response to his inquiries about obtaining a graduate student instructor position for the upcoming spring 2018 semester.  Vernon wrote:  "[L]ast week we learned that you are not in a position to advance to candidacy by June 30.  Unfortunately, this is the date by which you would have to advance in order to claim the research semester funding from the department for the Fall semester.

". . . [A]lthough June 30 is the normal date for your progress through the program to be considered 'satisfactory[,'] the field wants to give you additional time to write a strong prospectus and get the approval of a dissertation committee.  The department will give you until December 1, 2017, to write the prospectus and until December 15 to secure the acceptance of a committee.  Only when your prospectus is approved by a dissertation committee by the 15th December will the department be able to release your stipend for the spring semester.  [¶] . . . . [¶]

4

"I am afraid that if your prospectus is not approved by a dissertation committee by the 15 December 2017 your progress will be considered 'unsatisfactory[,'] since you will already have had an extra five months beyond the 'normal' deadline for advancement.

"While we are delighted you passed your Qualifying Exams we do want to emphasize that, even with this extended deadline for the approval of the prospectus, the road ahead to a successfully completed Ph.D. is a very difficult one. We urge you to spend some time this summer considering your options and consideration whether completing a Ph.D. dissertation is the best career path for you."

On or around July 13, Schmeder met with Vernon and raised several complaints about Mazzotti, including that he had failed to inform him of the deficiencies in his prospectus and continued to revise his standards and requirements for Schmeder without warning. He complained that one occasion, Mazzotti, "in a seeming fit of anger, required [Schmeder] to double the number of items on [his] reading list." Vernon investigated these allegations by speaking to Mazzotti and other faculty familiar with Schmeder. Schmeder also raised his concerns to Mark Peterson, then chair of the History Department.

Neither Vernon nor Peterson could substantiate Schmeder's complaints, but both sought to find ways for Schmeder to continue pursuing his prospectus. Vernon arranged for Schmeder and Mazzotti to meet and discuss the issues raised by Schmeder and determine if a path forward for Schmeder's prospectus was possible. At a meeting in August 14, Schmeder agreed to continue working with Mazzotti and to change his prospectus topic to address the concerns of faculty members about his prior topic.

Schmeder continued to work with Mazzotti and other faculty during

5

the 2017 fall semester on his prospectus, but it still fell short of meeting expectations. Additionally, Schmeder failed to form a dissertation committee consisting of at least two History faculty members willing to support and advise him on his project.

On December 15, Schmeder, accompanied by legal counsel, met with History Department heads, who informed Schmeder that his failure to develop an acceptable prospectus and to form a committee by the extended deadline placed him in unsatisfactory academic standing. Consequently, on December 18, Vernon wrote to Schmeder notifying him that he could withdraw from the program and if he did not, the Department would recommend his dismissal to the Dean the Graduate Division, then Fiona Doyle. The letter closed with website links to UC Berkeley's student campus grievance procedure, the graduate appeal procedure, and dismissal policy.

Schmeder did not withdraw from the program. As a result, he was informed on February 5, 2018, that he had been dismissed from the program.

Schmeder appealed the dismissal to the History Department's Graduate Affairs Committee ("GAC"). On May 2, the GAC upheld the dismissal.

Schmeder then appealed the dismissal to the Graduate Division Committee ("GDC"). Schmeder advanced several grounds for appeal, including "multiple instances of discrimination and abuse by [his] advisor . . . Mazzotti"; "the department's violation of the B.6 provisions" of the Graduate Council's November 1982 Memorandum on Academic Progress Evaluation, Academic Standing and Appeals Procedures ("1982 Memo"); "undermin[ing]" of his "attempt to form a dissertation committee" by faculty; and the failure of Vernon and Peterson "to properly investigate" his allegations about Mazzotti's misconduct. He further claimed that his dismissal deprived him of

6

his due process rights.  Schmeder submitted lengthy written summaries detailing his version of the events and hundreds of documents as supporting evidence.  In response, the faculty with whom Schmeder worked or interacted were requested to, and did submit, written statements in response to his allegations.

Schmeder's appeal was referred to the Administrative Committee of the Graduate Council, chaired by Dean Doyle, for investigation.  The Administrative Committee issued a five-page report dated April 24, 2019, addressing Schmeder's grievances in detail, the evidence submitted from both sides, and the reasons for ultimately rejecting Schmeder's claims.  On April 25, after reviewing Schmeder's appeal materials, the responses of the faculty identified in his appeal, and the Administrative Committee's report, Dean Doyle upheld Schmeder's dismissal.

On March 6, 2020, Schmeder, in pro per, filed the operative first amended petition for writ of mandate pursuant to Code of Civil Procedure[2] section 1094.5, though his sixth cause of action—for failure to proceed in the manner required by law—requested, in the alternative, traditional mandamus relief under section 1085.  Schmeder sought a writ of mandate directing the University to, among other things, set aside its dismissal decision and to reinstate him as a student in good academic standing.

Schmeder subsequently filed a motion to strike certain documents from the administrative record, which motion the court denied after holding a hearing.  Later, Schmeder submitted both a motion to augment and a "motion to complete the administrative record" to include several documents.

On January 29, 2021, the court conducted a hearing on Schmeder's

_____

[2] Undesignated statutory references are to the Code of Civil Procedure.

petition and requests to augment the administrative record. After taking the matter under submission, the court, by written order on March 24, denied the petition, but granted in part the requests to augment the record. On April 14, judgment in favor of the University was filed.

Schmeder then filed a motion to vacate or set aside the March 24 order, which the court denied.

This appeal followed.

## DISCUSSION

### Introduction

In Schmeder's opening brief, which is 69 pages long and over 16,670 words, he offers seven separately headed arguments challenging his dismissal from the doctoral program, many of them with multiple subparts, which themselves have sub-subparts. But the subparts or sub-subparts are not always confined to the point raised in the main heading. Also, arguments on the same issues at times are repeated throughout the brief under different headings. As a result, Schmeder's brief is convoluted and difficult to follow.

Compounding this is Schmeder's failure to adhere to rules of appellate procedure. Schmeder's opening brief raises many arguments without supporting them with cogent analysis or authority other than general abstract principles. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [requiring briefs to "support each point by argument and, if possible, by citation of authority"]; *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078 (*Alcoholic Beverage Control*) ["Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review"]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["Hence, conclusory claims of error will fail"].) On top of that, factual references often lack proper record citations. (Cal. Rules of Court,

8

rule 8.204(a)(1)(C); *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 (*Nwosu*).)

Moreover, where Schmeder attacks the sufficiency of the evidence supporting the University's findings, he sets forth only the evidence that favors him, rather than all the material evidence on the point. The failure to fairly summarize the evidence forfeits the claim of error. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*); *Oak Valley Hospital Dist. v. State Dept. of Health Care Services* (2020) 53 Cal.App.5th 212, 237.)

Schmeder, as a self-represented litigant, is not exempt from compliance with the rules of appellate procedure. (See *Nwosu, supra,* 122 Cal.App.4th at p. 1247.) As such, we may treat arguments not properly presented as forfeited. (See *Alcoholic Beverage Control, supra,* 100 Cal.App.4th at p. 1078; *Nwosu, supra,* 122 Cal.App.4th at p. 1246.)

Notwithstanding these shortcomings, we will address Schmeder's arguments as best we understand them, which in our view fall into four broad categories: (1) the failure of the History Department to give sufficient notice of his academic deficiencies and an opportunity to correct them, in violation of the University's own rules and his right to due process; (2) the failure of the GDC to use fair procedures in the administrative appeal proceedings, in violation of due process and/or his common law right to a fair hearing; (3) the arbitrary, capricious, and bad faith nature of the University's decision to dismiss him, in violation of substantive due process; and (4) the trial court's erroneous rulings concerning the scope of the administrative record. Before we turn to Schmeder's arguments, we set forth general legal principles governing mandamus actions.

### General Mandamus Principles and Review Standards

Schmeder's first amended petition was framed as one for

9

administrative mandate under section 1094.5, though his sixth cause of action—failure to proceed as required by law based on the violation of section B(6) of the 1982 Memo—alternatively sought relief for ordinary mandate under section 1085. The University asserts that administrative mandate is the type of writ relief that should govern here. Although the petition was properly presented under section 1094.5, relief was also appropriately sought under section 1085 for reasons now explained.

"The nature of the administrative action or decision to be reviewed determines the applicable type of mandate." (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848.) "In general, administrative mandate under . . . section 1094.5 is used to review the validity of quasi-judicial decisions resulting from a proceeding in which (1) a hearing was required to be given, (2) evidence was required to be taken, and (3) discretion in the determination of facts was vested in the agency. [Citation.] In administrative mandate cases, abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by substantial evidence in light of the whole record. (. . . § 1094.5, subds. (b), (c).)" (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 593 (*Martis*).)

Ordinary mandate under section 1085 is available "where the petitioner has no plain, speedy and adequate alternative remedy; the respondent has a clear, present and usually ministerial duty to perform; and the petitioner has a clear, present, and beneficial right to performance. [Citations.] Where a petition challenges an agency's failure to perform an act required by law rather than the conduct or result of an administrative hearing, the remedy is by ordinary mandate pursuant to . . . section 1085, not

10

by administrative mandate pursuant to section 1094.5. [Citation.]" (*Conlan v. Bonta* (2002) 102 Cal.App.4th 745, 752.) "In such cases, the appropriate standard is whether the agency's action was arbitrary, capricious, entirely lacking in evidentiary support, or failed to follow the procedure required by law." (*Martis, supra,* 53 Cal.App.5th at p. 594.)

The petition in this case challenges, in part, the University's purported failure to act as required by law in not providing Schmeder written notice of his academic deficiencies as required by section B(6) of the 1982 Memo. This was not the product of quasi-legislative decision by the University or a quasi-judicial adjudicatory decision after a required hearing. It instead was the product of an action—or inaction—at the History Department level, so it qualifies as an informal or ministerial administrative action subject to review by ordinary mandate. (See *Conlan v. Bonta, supra,* 102 Cal.App.4th at p. 752.)

The petition also challenges the results of his appeal before the GDC. The decision to dismiss a student from a doctoral program is far more adjudicatory than legislative in nature, placing it in the natural domain of section 1094.5. While UC Berkeley's "Graduate Appeal Procedure" does not explicitly refer to a hearing, a right to a hearing may be implied where the proceedings entail an adversarial exchange. (See *Eureka Teachers Assn. v. Board of Education* (1988) 199 Cal.App.3d 353, 362 ["It is not necessary that a *specific* provision for a hearing and taking of evidence be stated for . . . section 1094.5 to apply"]; see also Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2022) ¶ 13:203 ["Some cases *imply* a right to an evidentiary adjudicatory hearing (and thus to § 1094.5 review) where the applicable statute calls for an 'administrative appeal' or a 'meeting' or permits an employee to be discharged only 'for cause' . . ."], citing *Nathan*

11

*G. v. Clovis Unified School Dist.* (2014) 224 Cal.App.4th 1393, 1400–1402 (*Nathan G.*); *Caloca v. County of San Diego* (2002) 102 Cal.App.4th 433, 444; *Chavez v. Civil Service Commission of Sacramento County* (1978) 86 Cal.App.3d 324, 331–332; *Valenzuela v. Board of Civil Service Commissioners of City of Los Angeles* (1974) 40 Cal.App.3d 557, 564, 565.)

Here, UC Berkeley's Graduate Appeal Procedure provides students with a right to appeal a dismissal made by a major department. It permits the parties to submit opposing evidence and argument. The Graduate Division Dean serves as a neutral and final adjudicator and is required to consider and weigh the parties' evidence and arguments. The Graduate Appeal Procedure also states that a student is entitled to a "personal appearance before the investigative officer, if desired." The student may bring legal counsel or other representative. This personal appearance is the type of adversarial hearing contemplated by section 1094.5. (See *Nathan G.*, *supra*, 224 Cal.App.4th at p. 1393.) The fact that the student must request the personal appearance for the University to be required to provide one does not affect the applicability of section 1094.5. (See *Nathan G.*, at p. 1393.) This is because once the student requests that appearance, the University's procedure "does not expressly confer on the school . . . the discretion to decline." (*Id.* at pp. 1401–1402.) To the contrary, if a personal appearance is requested by the student, the University states that "[t]he individual or committee in charge of the investigation *will* . . . [¶] . . . [¶] . . . arrange for a personal appearance by the student." (Italics added). Under these circumstances, the validity of the GDC's decision was appropriately challenged by a petition for administrative mandate.

Having said this, the distinctions between ordinary and administrative mandate have minimal impact on Schmeder's substantive challenges to the

University's actions and findings. Whether presented in mandamus proceedings brought under section 1085 or 1094.5, the review of factual findings should be the same: that is, foundational factual findings must be sustained if supported by substantial evidence. (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1443.) "[U]nder either standard . . . it would be very difficult for [petitioner] to have the [agency's] adverse factual findings overturned" (*State Board of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963, 977), since we review evidence in the light most favorable to the agency's decision, disregard the contrary evidence, and draw all reasonable inferences to uphold the decision. (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073–1074 (*UCSD*).) Also, under either standard, we independently review questions of law, including the ultimate determination of whether the administrative proceedings were fundamentally fair or due process was afforded, as well as the interpretation of the University's internal rules. (See *Rosenblit v. Superior Court, supra,* 231 Cal.App.3d at p. 1443; *Tafti v. County of Tulare* (2011) 198 Cal.App.4th 891, 896; *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271–1272.)

On the other hand, the distinctions between ordinary and administrative mandate do matter in our review of Schmeder's challenges to the trial court's rulings concerning the administrative record. The rules relating to the administrative record are different depending on which type of writ review applies. While extra-record evidence is largely inadmissible in administrative mandamus cases, such evidence is admissible "in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, fn. omitted.) Here, Schmeder urges us to review

13

the court's rulings pertaining to the administrative record in accordance with the rules for administrative mandate.  Those rulings are reviewed for abuse of discretion.  (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1144; *Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 100.)

Against this background, we turn to Schmeder's arguments, analyzing them in a different order than he presents them in his opening brief.

**Notice**

Schmeder argues the History Department did not give him adequate notice that it would review his draft prospectus prior to June 30, 2017—the deadline by which a student must advance to candidacy if he or she is to remain on normative time—and an opportunity to correct any deficiencies by that date.  Schmeder claims these failures violated section B(6) of the 1982 Memo and thereby violated his due process rights.[3]

---

[3] Schmeder also argues the Department violated section E1.6 of the Graduate Division's "Coursework, Grading, Probation and Dismissal Policy," but he does not present any cogent argument, other than mentioning what the policy states.  This argument is thus forfeited.  (*Alcoholic Beverage Control*, *supra*, 100 Cal.App.4th at p. 1078.)  We also deem forfeited Schmeder's additional claims that the department failed to comply with section F(2)(6) of the "Graduate Division Policy," which requires that an evaluation of a qualifying exam must reflect only the student's performance on the exam and no other criteria; and a provision in the department's Program Guide for graduate students, which states "[s]tudents who successfully pass the [QE] will make preparations to advance to doctoral candidacy by 30 June of their fourth year."  It does not appear Schmeder asserted noncompliance of these provisions in the administrative proceedings, thereby forfeiting them on appeal.  (See *Harris Transportation Co. v. Air Resources Board* (1995) 32 Cal.App.4th 1472, 1480.)  In any event, Schmeder's arguments on those provisions fail on the merits because they are based on the same arguments underlying his section B(6) claims, which we now reject.

14

***Applicable Law***

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' [Citations.]" (*American Manufacturers Mutual Ins. Co. v. Sullivan* (1999) 526 U.S. 40, 59; *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 214.) "[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.' " (*Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 541; *Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, *supra*, 57 Cal.4th at p. 214.)

Schmeder does not state a specific property or liberty interest that was violated; indeed, he makes no attempt to articulate his due process claim at all. Notwithstanding, his arguments suggest he is alleging an interest in his continued enrollment in UC Berkeley's Ph.D. program in good academic standing. Given that the University has not argued the issue, and in fact appears to concede that its decisions are subject to judicial review under a due process standard, we will assume, as other courts have, that such property or liberty interest exists. (See *Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 199 (*Lachtman*) [although "[n]o United States or California Supreme Court opinion holds a student has a property or liberty interest in continued enrollment in good standing in an academic program," courts have "assumed, without deciding, that a public university's academic decisions are subject to judicial review under a due process standard"], citing *Board of Curators of University of Missouri v. Horowitz* (1978) 435 U.S. 78, 91–92 (*Horowitz*); *Regents of University of*

15

*Michigan v. Ewing* (1985) 474 U.S. 214, 222 (*Ewing*).)[4]

We next address what process was due. In *Horowitz*, the seminal case in the area of a student's due process rights, the Supreme Court explained that the level of procedural protection that students are due varies depending on whether they were dismissed for disciplinary or academic reasons. (See *Horowitz, supra*, 435 U.S. at p. 86.) Academic dismissals "call[ ] for far less stringent procedural requirements" than in disciplinary dismissals. (*Ibid.*, fn. omitted.) "Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full-hearing requirement." (*Id.* at p. 89.) The court therefore "decline[d] to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing." (*Id.* at p. 90.)

Thus, where, as here, dismissal is based on academic deficiencies rather than disciplinary reasons, "under *Horowitz*, a university satisfies the demands of procedural due process if it informs the student of its dissatisfaction with the student's academic performance, it informs the student of the consequences of deficient performance, and a decision regarding the student's academic progress is careful and deliberate." (*Lachtman, supra*, 158 Cal.App.4th at p. 201; *Horowitz, supra*, 435 U.S. at pp. 91–92.)

Schmeder does not appear to argue that he was not afforded the constitutional minimum of procedural due process as set forth in *Horowitz*.

---

[4] Also, as in *Horowitz*, we need not decide "whether [Schmeder's] dismissal infringed any other interest constitutionally protected against deprivation without procedural due process," such as Schmeder's continued financial support from the University, an interest he suggests is also at issue. (*Horowitz, supra*, 435 U.S. at pp. 84–85.)

Schmeder asserts that "[d]ue process is enshrined by the second and third paragraphs of [section B(6)]," thus suggesting that a violation of those provisions is per se a violation of due process. As detailed below, section B(6) requires that before a student is subject to dismissal or other similarly severe action, he or she must be informed of writing of, among other things, "(a) The nature of the problem or deficiency; [¶] (b) Steps that should be taken to correct the deficiency; [and] [¶] (c) A reasonable period of time in which the student is expected to correct the problem of show improvement acceptable to program faculty . . . ." While paragraph (a) is consistent with *Horowitz*'s requirement that a university "inform[] the student of its dissatisfaction with the student's academic performance," it appears paragraphs (b) and (c) go beyond the minimum required by due process. (*Lachtman, supra,* 158 Cal.App.4th at p. 201.) Schmeder does not explain how, then, a violation of section B(6) is equivalent to a violation of due process. (See *Levitt v. University of Texas at El Paso* (5th Cir. 1985) 759 F.2d 1224, 1230 ["There is not a violation of due process every time a university or other government entity violates its own rules"].) In any event, even if we were to assume that paragraphs (a) through (c) of section B(6) added to the constitutional minimum prescribed in *Horowitz*, we would conclude that due process was satisfied here.

### *Analysis*

As noted, section B(6) of the 1982 Memo states, in relevant part: "If the faculty reviewing a student's record determines that there exists a particularly serious deficiency in the rate of progress or in the quality of work performed—that is a deficiency which, if left uncorrected, could lead to a recommendation for dismissal, refusal of permission to proceed to the Doctorate, lapsing or termination of candidacy, or other action of similar severity—then the Council requires that the student be informed in writing

17

of:  [¶] (a) The nature of the problem or deficiency; [¶] (b) Steps that should be taken to correct the deficiency; [¶] (c) A reasonable period of time in which the student is expected to correct the problem or to show improvement acceptable to program faculty; and [¶] (d) The approximate date at which the student's record will next be reviewed.

"Except under the most unusual circumstances, the Dean of the Graduate Division will not approve a recommendation for dismissal, for termination of candidacy, or other action of similar severity, unless the foregoing requirements have been met.  It is the opinion and policy of both the Council and the Graduate Division that no student should be subject to action of such a drastic nature unless he or she has been given adequate written warning and a reasonable opportunity to correct the deficiency."

Schmeder argues the History Department did not comply with these provisions because it (1) did not warn him that it would evaluate his draft prospectus on May 9, 2017, seven weeks before the June 30 deadline to advance to candidacy, and (2) immediately acted upon its negative evaluation of his prospectus by withholding approval of his advancement to candidacy without giving him the seven weeks remaining before June 30 to submit a revised prospectus.  Schmeder describes the Department's actions as "preemptively denying his advancement to candidacy."  We are not persuaded.

To begin with, Schmeder's characterization that the department "preemptively denied his advancement to candidacy" is somewhat misleading.  As of May 9, 2017, Schmeder's ability to advance to candidacy essentially was delayed, not denied.  As the trial court explained, the committee on May 9 did not "fail" Schmeder's dissertation project or determine it "could never be approved."  Rather, the committee, who "was in

18

a position to judge" whether Schmeder would be "able to submit a satisfactory prospectus in time to advance by June 30," "judged that the prospectus was not adequate in its then present form" and recommended to Vernon that Schmeder "be afforded an additional six months to improve the prospectus so that [he] could advance to his PhD candidacy."

Additionally, the parties offer different interpretations of section B(6), and Schmeder does not establish that his is correct. The University argues that the relevant action and point in time for purposes of determining compliance with section B(6) is Schmeder's dismissal in December 2017. Under this interpretation, the University argues, and Schmeder appears to concede, that if we look to all the events leading up to the dismissal, Schmeder received the requisite notice and opportunity to correct his deficiencies before he was dismissed. Schmeder, however, suggests that the committee's decision on May 9 to withhold approval of his advancement to candidacy, not his dismissal, is controlling on the question of compliance. But Schmeder does not explain the basis for interpreting section B(6) in such a manner.

As noted, the stated purpose of section B(6) is to ensure a student is given adequate written notice and a reasonable opportunity to correct an academic deficiency before he or she is subject to "dismissal, . . . termination of candidacy, or other action of similar severity." The terms "subject to dismissal," "lapsing of candidacy," and "termination of candidacy" are expressly defined in section 9 of the 1982 Memo. For example, "[a] student becomes subject to dismissal . . . if, following a reasonable period of probation, the student has not corrected the deficiencies that originally led to probationary status." The terms "lapsing" or "termination of candidacy" are irrelevant here, as they apply only to students who have advanced to

19

candidacy.

When the committee found on May 9 that Schmeder was not in a position to advance to candidacy by June 30, Schmeder was not "subject to dismissal" within the meaning of the 1982 Memo. Rather, he was "subject to dismissal" much later, when he failed to correct his academic deficiencies by the extended December 15 deadline. Also, while the May 9 decision to delay Schmeder's advancement to candidacy did cause a setback to his academic standing and financial support, he does not demonstrate it was an "action of similar severity" to dismissal or any of the actions identified in section B(6). Indeed, Schmeder was not even placed on academic probation. Instead, as Schmeder acknowledged, he "was given the lesser sanction of a letter of warning." Thus, it is not entirely clear that the committee's May 9 decision, rather than Schmeder's dismissal in December 2017, serves as the relevant action for purposes of determining compliance with section B(6).

But even if the May 9 decision was controlling, we would still hold that the University complied with section B(6). The record supports that Schmeder, despite not being presented with a formal "single [l]etter" containing a recital of the section B(6) requirements, received notice of the problems with his prospectus and an opportunity to correct them prior to May 9. Schmeder does not dispute that throughout the 2016–2017 school year, he worked closely with several faculty members on his prospectus and received both written and verbal feedback setting forth specific deficiencies in his prospectus. As the GDC found, "Davies gave detailed feedback on his prospectus during the [2016–2017 academic year] and raised a number of significant problems with at least two drafts. Sheehan met with Schmeder in March 2017 to discuss the prospectus in person, at which time Sheehan declined to join the committee. And Laqueur received a draft in April 2011,

20

and replied with written comments which, while brief, clearly indicated that the document was not yet acceptable."

Indeed, Schmeder acknowledged as much, stating: "It is true that the prospectus lacks a finished lit review, and presents no research plan; these are waiting in the wings in semi-complete form, along with a semi-complete annotated bibliography. I did work steadily with my dissertation committee this Spring, putting the prospectus through two additional rounds of revision (we started in Fall), but attention was turned to theoretical issues, and I believed—wrongly, I realize—that the lit review and research plan could be added near the end of the process. Then in the wake of qualifying exams, I sat on my haunches for too long."

The record thus demonstrates that Schmeder was given sufficient notice of his academic deficiencies and an opportunity to correct them before the committee decided on May 9, he was not in a position to advance to candidacy by June 30.

Schmeder's assertions that the committee should have warned him it would review his prospectus on May 9, and then should have given him the next seven weeks to submit a revised prospectus, do not convince us otherwise. These arguments apparently are premised on his assumption that June 30 is the deadline both to advance to candidacy and to submit the final draft of the prospectus. This premise is flawed.

UC Berkeley's policies require the submission, review, and approval of a prospectus *prior to* June 30 of a student's third year in order for the student advance to candidacy by that date, and Schmeder does not dispute he was aware of those requirements. Specifically, the History Department's graduate studies program guide states that "[s]tudents who successfully pass the qualifying examination will make preparations to advance to doctoral

candidacy by 30 June of their fourth year. (Note: students advancing after this date will be ineligible to apply for a full year of the departmental research year grant.) The GAC and the Graduate Division must approve the student's dissertation committee. . . . The dissertation committee must approve the student's prospectus in order for the student to advance." In addition, section B(5) of the 1982 Memo states: "Apart from general, campuswide degree requirements, individual departments . . . may, with the approval of the Graduate Council institute additional progress require-ments [*sic*] for students in programs under their jurisdiction. Such requirements may include, but need not be limited to: [¶] . . . [¶] (e) Submission of an acceptable thesis or dissertation prospectus *prior to advancement to candidacy . . . .*" (Italics added.) The 1982 Memo also encourages faculty at a student's qualifying exam to "determine whether the candidate is ready to enter the research phase of graduate studies," though the exam itself "is not to be concerned solely with the proposed dissertation research." Further, the 1982 Memo provides that after a student passes a qualifying exam, he or she "should apply for advancement to candidacy . . . as soon as possible following the examination."

It is clear that the submission and acceptance of a prospectus are conditions precedent to advancing to candidacy by June 30. Thus, the GDC correctly observed that "[f]or the committee to approve the prospectus by June 30, they would need to have received the final draft to review well before that date." And Schmeder does not dispute he was informed of the requirements and timelines for advancing to candidacy within normative time, as well as where he stood with respect to those requirements and timelines. In fact, the record reveals Schmeder was expressly aware that he needed to submit his prospectus for review well before June 30 and the

22

consequences of failing to do so. Two days before the June 30 deadline, Schmeder emailed Mazzotti a revised prospectus and wrote: "Alas, I waited until the last minute to submit my prospectus to you and my committee members. The department deadline is Friday, which means I probably doomed my research semester. I certainly don't expect you to evaluate it in time."

As this incident illustrates, if the deadline to advance to candidacy were the same date as the deadline to submit a prospectus, then the prospectus would not be reviewed in time for the student to obtain approval and therefore advance to candidacy within the prescribed time. That situation would be the type of anomalous result that would occur were we to accept Schmeder's assumption that June 30 is the deadline both to advance to candidacy and to submit the final draft of the prospectus. Schmeder's position not only is inconsistent with UC Berkeley's policies, but also makes no sense from a practical standpoint. Thus, he cannot credibly claim that it was improper for the committee to evaluate his prospectus and make a decision thereon before June 30.

Nor is there any merit to Schmeder's assertion that "[t]he GDC privately determined that the Department had in fact deviated from §B.6." Schmeder points to an April 2019 email thread among Ian Duncan, an investigator for the GDC, Dean Doyle, and other UC Berkeley personnel under subject line "Suggestions for the History Department."[5] One of the emails refers to, and attaches a document referring to, "suggestions to the

---

[5] This email is not included in the administrative record and is the subject of Schmeder's separate assertion that the trial court erred in denying his motion to augment the administrative record. We address this argument in our discussion of administrative record issues *post*.

23

History Department about future best practices." One of the staff responds, "This looks great . . . . Is it worth adding/spelling out a recommendation that departmental practice come into closer compliance with the B6 clause, i.e. provide written feedback, or at least some sort of record of notification, to students who are at risk of failing to make satisfactory progress?" According to Schmeder, these communications disclose "[t]he GDC privately determined that the Department" did not comply with section B(6). We disagree.

Schmeder's argument is based on pure speculation. The emails do not refer to Schmeder or his case. Nor does it contain any admission of wrongdoing or a lack of compliance with section B(6). In addition, the portion of the record cited does not include the "suggestions" referred to in the email. The trial court thus was correct to observe that it "can't make the intellectual leaps of conclusion to a huge chasm like between what you think this means and what it actually says."

In short, the record supports that the University afforded Schmeder sufficient notice of his academic deficiencies and an opportunity to correct them prior to the committee's decision on May 9, 2017, and certainly prior to his dismissal. As such, the University complied with both its own policies and procedural due process.[6]

**Fair Hearing**

Schmeder also argues that the GDC denied him a fair hearing and due

---

[6] The parties debate the applicability of the doctrine of substantial compliance, which "excuses literal noncompliance only when there has been actual compliance with the essential objective of the statute." (*Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1431.) We need not address this issue, because whether the standard is strict or substantial compliance, Schmeder was given notice of his academic deficiencies and a reasonable opportunity to correct them.

24

process because it relied on uncorroborated hearsay, failed to apply the preponderance of the evidence standard of proof, and withheld evidence.

Initially, we note that Schmeder's argument pertaining to hearsay, though initially framed as one of fair hearing and due process, is actually a substantial evidence argument. Thus, to the extent he asserts fair hearing and due process violations based on the GDC's alleged consideration of hearsay, those claims are "perfunctorily asserted without legal development," such that "[w]e may," and do, "properly disregard" them.[7] (*Cameron v. Sacramento County Employees' Retirement System* (2016) 4 Cal.App.5th 1266, 1282.)

Turning to the burden of proof issue, Schmeder cites no authority for his position that due process or fair process required the application of the preponderance of the evidence standard of proof when evaluating the evidence before it. In fact, he provides no authority to support that the GDC was required to follow the formal rules of evidence normally applicable in judicial proceedings. Nothing in UC Berkeley's Graduate Appeal Procedure or any other policy so requires.

Even if the preponderance of the evidence standard applied, Schmeder presents no argument or evidence to show that the GDC failed to apply this standard in reaching its decision. Nor has he shown that any such failure to do so was prejudicial. (See *Pinheiro v. Civil Service Commission for the County of Fresno* (2016) 245 Cal.App.4th 1458, 1464 (*Pinheiro*) ["Generally, we reverse only if the alleged error prejudicially affected the appellant's substantial rights"]; *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308 [to show prejudice, appellant must "show it is

---

[7] We do, however, address the substantial evidence claim within our discussion of substantive due process *post*.

25

reasonably probable he or she would have received a more favorable result at trial had the error not occurred"].)  Accordingly, "there is no merit in the contention that [Schmeder was] deprived of procedural due process because the [GDC] did not follow the rules of evidence usually applicable in judicial proceedings . . . ."  (*Goldberg v. Regents of University of California* (1967) 248 Cal.App.2d 867, 883.)

Likewise unavailing is Schmeder's claim that the GDC violated due process by withholding evidence from him.  Although Schmeder's heading for this argument states that the failure to disclose evidence was in violation of due process, his legal argument section cites to authorities addressing the "fair trial" or "fair hearing" standard under section 1094.5.  No due process analysis is presented.  Constitutional due process is not synonymous with the right to fair process under section 1094.5.  (See *Pinheiro*, *supra*, 245 Cal.App.4th at p. 1463.)  Given the absence of any meaningful argument to support the due process claim, we deem such a claim waived.  We thus construe Schmeder's argument as one of state, not federal constitutional, law.

Schmeder specifically argues that GDC failed to disclose to him Vernon's January 24, 2018 letter to Dean Doyle recommending his dismissal.[8]  He claims that "Vernon had falsified his academic record to Dean Doyle in order to obtain his dismissal."  Had he been shown the letter, Schmeder claims, he would have been able to impeach it with other evidence.

Schmeder quotes various cases stating the general principle that the failure to disclose evidence may amount to a denial of a fair hearing.  For example, he relies on *Pinheiro*, *supra*, 245 Cal.App.4th 1458, 1468, in which a

---

[8] Schmeder also argues that the trial court erred in denying his motion to augment the record to include Vernon's letter.  We address this argument below.

26

former county employee, Pinheiro, sued the county's civil service commission on the grounds that the commission's reliance on extrinsic evidence in upholding his dismissal denied him is right to a "fair trial" under section 1094.5. (*Pinheiro*, at pp. 1462–1463.) The appellate court extensively discussed how the extra-record evidence related to the key issue of Pinheiro's credibility in the underlying proceedings. (See *id.* at pp. 1470–1472.) It noted that "Pinheiro was not apprised that the Commission would later consult [Pinheiro's hearing testimony] to garner evidence which it then used to undermine Pinheiro's credibility." (*Id.* at p. 1469.) The court therefore concluded that consideration of the evidence was error and not harmless. (*Id.* at p. 1471.)

Schmeder also relies on *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221 (*USC*). In *USC*, a student, John Doe, was found to have violated USC's student conduct code based on an alleged sexual assault of another student. (*Id.* at p. 224.) John argued he was denied a fair hearing when he did not receive any information regarding other witnesses' testimony. (*Id.* at p. 244.) The appellate court agreed, explaining: "John was not provided any information about the factual basis of the charges against him, he was not allowed to access any evidence used to support those accusations unless he actively sought it through a written request, and he was not provided with any opportunity to appear directly before the decisionmaking panel to rebut the evidence presented against him. While a full trial-like proceeding with the right of cross-examination is not necessary for administrative proceedings, we cannot agree with USC that the process afforded to John met the standards of a fair hearing under . . . section 1094.5." (*USC, supra*, 246 Cal.App.4th at p. 248, fn. omitted.)

Schmeder further cites *Department of Alcoholic Beverage Control v.*

27

*Alcoholic Beverage Control Appeals Board* (2006) 40 Cal.4th 1. There, the Supreme Court invalidated the practice by the Department of Alcoholic Beverage Control in which the ultimate decision maker on license revocations routinely received ex parte briefings by the attorney who prosecuted the license revocation accusation. (*Id.* at pp. 6, 15–17.) The court held that "a prosecutor cannot communicate off the record with the agency decision maker or the decision maker's advisors about the substance of the case." (*Id.* at p. 17.) Our Supreme Court was "not persuaded" by a claim the submission of ex parte communications "was harmless," both because the record did not reflect the content of those communications and because only one party to the proceedings had been permitted to submit such communications. (*Id.* at p. 17.)

The cited cases are distinguishable. Here, in contrast, Vernon's letter contains largely a summary of Schmeder's academic record and the events leading up to the History Department's recommendation of dismissal, facts that were already known to Schmeder. Thus, he was not deprived of any new, critical evidence that he lacked an opportunity to rebut.

Schmeder nevertheless maintains that Vernon "falsified" his academic record in the letter. For example, Schmeder contends Vernon inaccurately wrote that Schmeder was " 'unable to produce a dissertation prospectus that could be approved by the several faculty he had approached.' " Schmeder claims that statement is untrue because he in fact was able to recruit certain faculty members to serve on his dissertation committee: three from the English and Music Departments (Professors Falci, Piccioto, and Davies) and one from the History Department (Professor Frede-Montemayor). But this fact does not undermine the veracity of Vernon's statement that Schmeder could not form a committee pursuant to departmental requirements. That is,

28

Schmeder needed *two* willing faculty members from the History Department to serve on the committee, and he had found only one.

Schmeder also argues that Vernon concealed from Dean Doyle the fact that Frede-Montemayor had approved his prospectus. The factual premise of this argument is belied by the record. There was no such approval by Frede-Montemayor. Although Frede-Montemayor gave Schmeder positive feedback on his prospectus, she explained that because she was not an expert in the research topics, she was unable to verify whether Schmeder's arguments were correct and thus chose to defer to other faculty with the relevant expertise.

Schmeder next maintains that Vernon presented his overall academic record in a false light. Schmeder faults Vernon for not explaining to Dean Doyle that Schmeder had acquired "incompletes" in some of his classes because he had been struggling with personal issues and a family medical illness. That Vernon outlined Schmeder's academic record without explaining any of his personal circumstances is not equivalent to Vernon falsifying Schmeder's academic record. Furthermore, Schmeder's focus on Vernon's recitation of his grades is misplaced. When fairly read, Vernon's letter recommended dismissal based on the decline of Schmeder's academic progress "since partially failing his first Qualifying Exam in November 2016," not his grades.

In sum, Schmeder has failed to show that the procedures the GDC used in the appeal proceedings deprived him of his right to a fair hearing or due process.

**Arbitrary Dismissal**

In the introduction to his opening brief, Schmeder asserts "[t]he facts of this case demonstrate systemic disregard for the due process rights of graduate students," who "are supposed to be protected from academic

decisions that are 'arbitrary, capricious, or in bad faith.' (*Wong v. Regents of University of California* (1971) 15 Cal.App.3d 823, 829.)" Throughout his opening brief, Schmeder argues that the decision to dismiss him was arbitrary and in bad faith. These arguments in essence assert a claim for violation of substantive due process.

### *Applicable Law*

The guarantee of due process of law includes a substantive component. (*Reno v. Flores* (1993) 507 U.S. 292, 301–302; *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 708.) "In deciding whether a student's substantive due process rights have been violated, we start with the 'widely accepted rule of judicial nonintervention into the academic affairs of schools.' [Citation.] ' "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." ' [Citation.] Judicial review of a university's academic decision is a 'narrow avenue' restrained by '[c]onsiderations of profound importance.' [Citation.]" (*Lachtman, supra*, 158 Cal.App.4th at p. 203–204.)

A limited exception to nonintervention is recognized, and substantive due process rights will be violated, if the challenged decision was the product of arbitrary state action rather than a conscientious, careful, and deliberate exercise of a professional judgment. (*Lachtman, supra*, 158 Cal.App.4th at p. 204, citing *Ewing, supra*, 474 U.S. at p. 225.) "We may only overturn the university's decision if we find it to be arbitrary and capricious, not based upon academic criteria, and the result of irrelevant or discriminatory factors. [Citations.] We must uphold the university's decision 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' [Citation.]" (*Banks v. Dominican College* (1995) 35 Cal.App.4th

30

1545, 1551 (*Banks*).)

### *Analysis*

The evidence before us supports the GDC's finding that the department's recommendation to dismiss Schmeder was made in good faith, and therefore did not violate his substantive due process rights. His performance in the doctoral program raised doubts on the part of at least four faculty members about his suitability to present an adequate dissertation prospectus. Schmeder was given guidance on specific areas of improvement, but he did not always take on that feedback. Additionally, faculty found him difficult to work with and obstreperous. As we read the record, the decision was based on academic criteria and professional judgment, not arbitrary, capricious, or discriminatory factors. (*Ewing*, *supra*, 474 U.S. at pp. 223–225; *Lachtman*, *supra*, 158 Cal.App.4th at pp. 204–205; *Banks*, *supra*, 35 Cal.App.4th at p. 1551.)

Schmeder nonetheless claims he was dismissed for non-academic and arbitrary reasons. The alleged primary source of mistreatment was Mazzotti, whom Schmeder claims sought to have him expelled due to personal malice against him. Schmeder asserts that other faculty—Vernon, Laqueur, and Peterson—also acted in bad faith by failing to adequately investigate his complaints about Mazzotti. He then accuses Vernon and Laqueur of "arrang[ing] . . . to sink [his] dissertation project" after he was granted the six-month extension. The GDC rejected these contentions, concluding that "the department acted in good faith in making its decision" to dismiss Schmeder. Schmeder contends the GDC's finding of "good faith" is not supported by substantial evidence.

Before we turn to Schmeder's attacks on the evidence, we address some preliminary issues raised by Schmeder.

Although Schmeder argues for several pages in his opening brief the

lack of substantial evidence to support the GDC's finding of good faith, he closes his discussion of that issue by asserting that the GDC's failure to apply the preponderance of the evidence standard in the administrative proceedings "moots the issue of whether [its] evidence is substantial." He relies on case law stating that substantial evidence is inapplicable where the agency's decision was based on their failure to proceed in a manner required by law. Since we rejected Schmeder's argument that the GDC violated due process or his right to a fair hearing in not applying preponderance of the evidence, we likewise reject his claim that the GDC's "application of an incorrect standard moots the issue of whether the agency's evidence is substantial."

Schmeder also asserts that the University "forfeited its 'substantial evidence' claim when it ignored facts that rebutted its evidence," referring to unspecified "transcripts." He then cites the principle that " '[s]ubstantial evidence upon which a decision is based is not established by isolating evidence which supports the decision while ignoring other facts which rebut or explain that evidence.' " (*Gaytan v. Workers' Comp. Appeals Bd.* (2003) 109 Cal.App.4th 200, 219.) Schmeder misperceives the parties' roles on appeal and on substantial evidence review.

We " 'start [] with the presumption that the record contains evidence to sustain every finding of fact.' " (*Foreman, supra*, 3 Cal.3d at p. 881.) Therefore, Schmeder, as the party challenging the agency determination, has the burden to show the agency's decision was not supported by substantial evidence. (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1490.) To meet this burden, Schmeder must discuss the evidence on *both* sides, rather than make a one-sided presentation of the evidence supporting only his position. (*Foreman*, at p. 881.) If he fails to do so, the

32

agency's findings are presumed to be supported by substantial evidence. (*Ibid.*; *Oak Valley Hospital Dist. v. State Dept. of Health Care Services*, *supra*, 53 Cal.App.5th at pp. 237–238.) Under these principles, the University was not obligated to set forth evidence favorable to Schmeder.

Furthermore, it bears repeating that on substantial evidence review, "[w]e are required to accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the [agency's decision]. [Citation.]" (*UCSD, supra,* 5 Cal.App.5th at p. 1074.) " 'Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence.' [Citations.]" (*Id.* at p. 1073.)

Against these principles, we turn to Schmeder's challenges to the GDC's finding that the decision to dismiss him was in good faith.

First, Schmeder argues that the GDC's finding of good faith cannot be upheld because there is evidence that Vernon, Peterson, and Laqueur did not, in good faith, investigate complaints about Mazzotti's misconduct. With respect to Peterson, Schmeder asserts Peterson, in not finding "anything unusual" or "any hint" of anger by Mazzotti towards Schmeder, "concealed" information about Mazzotti. The accusation of concealment, however, is not supported by any reasoned analysis or citations to the record. As such, this contention has been forfeited and we decline to consider it. (See *Alcoholic Beverage Control*, *supra*, 100 Cal.App.4th at p. 1078; *Nwosu, supra,* 122 Cal.App.4th at p. 1246.)

With respect to Vernon and Laqueur, Schmeder argues the evidence shows "[Vernon] privately arranged in advance with Laqueur to sink Schmeder's dissertation project. As Laqueur told Vernon, 'nobody has

33

wanted to take final responsibility for [Schmeder,] tell me what to do and I will do it." The email thread to which Schmeder refers contains Vernon's and Laqueur's discussions regarding Schmeder's complaint to Vernon that "no one told him that his prospectus was inadequate." Laqueur disputed the claim to Vernon, explaining that he had pointed out to Schmeder the problems with his prospectus, though Laqueur did not "definitively tell [Schmeder] no" about not having a dissertation project. Laqueur stated that since "no one has been willing to take final responsibility for [Schmeder]," he would do so, under Vernon's guidance.

The email thread cannot be fairly read as demonstrating Vernon "had privately arranged in advance with Laqueur to sink Schmeder's dissertation project." As we read the emails, the discussion between Vernon and Laqueur was based on the inadequacy of Schmeder's prospectus and the need to convey that more strongly to him. Therefore, the record does not support Vernon's and Laqueur's discussion rested on non-academic criteria.

Second, Schmeder argues that the GDC "misrepresented Vernon's 'Letter of Warning' as an 'informal extension.'" This is in reference to the GDC's finding that although on May 9, 2017 the qualifying exam "committee was in a position to judge that Schmeder would not be able to submit a satisfactory prospectus in time to advance by June 30," they decided to extend the deadline for advancement to candidacy to December 15, when they instead could have placed Schmeder on academic probation. The grant of an extension was formalized in Vernon's June 6 letter to Schmeder. According to Schmeder, the GDC's finding gives the false impression that Vernon's letter was "a gracious 'formal extension.'" He claims that the department was *required* to give Schmeder an extension, and therefore the grant of the extension cannot be construed as a voluntary act to spare him from

34

probation.

The parties debate whether UC Berkeley's policies require, rather than permit, granting such an extension. We agree with the University that UC Berkeley's policies give a department the option to either recommend a student be placed on probation or give a warning letter. Section E1.6 of the Graduate Division Policy states: "If a program assesses a student's performance as below program expectations, it should inform the Graduate Division and proceed *either* to a warning letter *or* request that the student be placed on probation." (Italics added.) Section E1.7 then states: "Programs may choose to issue warning letters to apprise students that they are not making satisfactory progress rather than request formal probation." Thus, as the University asserts, "the GDC was correct that the Department had the option of either providing an extension, or placing Schmeder on probation, and the Department chose the less punitive option to give Schmeder a meaningful opportunity to complete his prospectus and form a dissertation committee." Indeed, Schmeder concedes that he "was given the lesser sanction of a letter of warning."

Third, Schmeder argues that Vernon "tried to obstruct" his ability to prepare a satisfactory prospectus and form a dissertation committee by the extended deadline of December 15, 2017. Schmeder quotes Vernon in an email where he discusses with colleagues about whether to restore Schmeder's stipend: "I'm minded to say no because the harder we make it for him, the [sooner he'll] realize he should be doing something else." In Schmeder's view, "Vernon openly stated that his intention was to impede Schmeder's return to the program."

Schmeder, however, neglects to mention Vernon prefaced the quoted statement with a description of Schmeder's academic deficiencies, namely his

35

"poorly prepared prospectus." Additionally, Vernon ended the email by deferring to other UC Berkeley staff members who had more knowledge on financial aid policies and Schmeder's particular financial aid status. And other staff did weigh in on the matter before it was determined Schmeder was not eligible to have his stipend released.

Furthermore, as the University argues, the loss of funding based on Schmeder's failure to prepare an acceptable prospectus in time is consistent with UC Berkeley policy, which states: "Failure to successfully complete the qualifying examination and advance to doctoral candidacy within normative time . . . has serious consequences, including loss of departmental and University aid." Additionally, the 1982 Memo provides that, "In many cases, persistence of [an academic] problem may lead to probation, to lapsing or termination of candidacy for a higher degree, or to eventual disqualification and dismissal from graduate standing. While it is hoped that such measures will not become necessary, the [Graduate] Council recognizes the need for their existence, both to protect the quality of graduate education at Berkeley and to protect students against the added time and expense of prolonging an ultimately unsuccessful period of study." Thus, in situations where a student's academic standing is in question, it is not inappropriate to consider, as Vernon did, whether a student's continued enrollment would result in needless time and expense. Schmeder cannot show that Vernon acted outside of academic norms in proposing not to release Schmeder's stipend.

Fourth, Schmeder asserts that the GDC "provid[ed] a cloak for Mazzotti's actual conduct" when it determined that on May 9, the QE committee as whole, rather than Mazzotti individually, found Schmeder's prospectus inadequate. Schmeder claims that the GDC relied upon the hearsay statements of Mazzotti, and that "[m]ere uncorroborated hearsay

36

does not constitute substantial evidence to support an administrative finding." He asserts that he had presented evidence to the GDC that "Mazzotti alone decided to withhold approval," but suggests that the GDC erroneously adopted Mazzotti's version of the events.

This argument is unavailing. The factual premise of Schmeder's argument that Mazzotti singlehandedly sought to have Schmeder dismissed for personal and discriminatory reasons was rejected by the GDC, and Schmeder does not offer any argument to demonstrate that finding was incorrect. For this reason, even assuming that Mazzotti was the main decision-maker behind whether to approve Schmeder's prospectus, that fact by itself does not support a finding of bad faith. Moreover, Schmeder's argument amounts to an invitation to reweigh the evidence, an invitation we decline. (See *UCSD, supra,* 5 Cal.App.5th at pp. 1073–1074.)

For all of these reasons, Schmeder has failed to establish that substantial evidence does not support the GDC's finding that the decision to dismiss him was made in good faith.

We finally address a stray argument pertaining to the University's alleged "arbitrary" dismissal raised elsewhere in the opening brief. Specifically, Schmeder argues that the University "departed substantially from academic norms when it evaluated [his] rough draft two months before its approval deadline and imposed penalties upon him." Relying on *Connelly v. University of Vermont & State Agricultural College* (D.Vt. 1965) 244 F.Supp. 156, 161, Schmeder argues that "a professor's preemptive decision to fail a student's work would be 'equivalent' to bad faith and capriciousness." There, the plaintiff, who was dismissed from a medical school, alleged that his teacher "decided early . . . 'that he would not give plaintiff a passing grade in [his course] regardless of his prior work in the

37

Spring and regardless of the quality of his work in said make up period.' " (*Ibid.*)  The court held that the plaintiff alleged a cognizable claim that "his dismissal was for reasons other than the quality of his work or in bad faith." (*Ibid.*)

*Connelly* is inapposite.  Here, unlike in *Connelly*, the decision to extend Schmeder's deadline to advance to candidacy and his ultimate dismissal came after, and was based upon, meaningful review of Schmeder's academic work. Further, although Schmeder makes much of the fact that the committee had reviewed his "rough draft two months before its approval deadline," as explained above, the record supports that "on May 9 the committee was in a position to judge that Schmeder would not be able to submit a satisfactory prospectus in time to advance by June 30."  During the 2016–2017 academic year, Schmeder had ongoing communications with faculty, who provided him detailed feedback on his prospectus.  Given that faculty were closely involved with Schmeder throughout the development of his prospectus, it was not arbitrary for the committee on May 9 to judge his draft prospectus as a reasonable indication of his ability to advance to candidacy by the end of the following month.

Accordingly, Schmeder has failed to establish that the University's decision to dismiss him was "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  (*Ewing*, *supra*, 474 U.S. at p. 225; *Lachtman*, *supra*, 158 Cal.App.4th at p. 204.)  That decision therefore did not deny Schmeder substantive due process.

**Administrative Record Issues**

Lastly, we turn to Schmeder's arguments that the trial court erred in (1) denying his motion to augment the record to include Vernon's January 24, 2018 letter and investigator Duncan's April 2019 email; (2) granting his

motion to augment the record to include the qualifying exam committee's May 9, 2017 report without remanding the case pursuant to section 1094.5, subdivision (e); and (3) denying his motion to strike the record to include documents related to his GAC appeal.  We reject these contentions.

### *Motion to Augment*

"The general rule is that a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency.  [Citation.]" (*Toyota of Visalia, Inc. v. New Motor Vehicle Board* (1987) 188 Cal.App.3d 872, 881.)  "Augmentation of the administrative record is permitted only within the strict limits set forth in section 1094.5, subdivision (e), which provides as follows:  'Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence . . . .'  [Citations.]  In the absence of a proper preliminary foundation showing that one of the exceptions noted in section 1094.5, subdivision (e) applies, it is error for the court to permit the record to be augmented.  [Citation.]  Determination of the question of whether one of the exceptions applies is within the discretion of the trial court, and the exercise of that discretion will not be disturbed unless it is manifestly abused.  [Citation.]" (*Pomona Valley Hospital Medical Center v. Superior Court, supra,* 55 Cal.App.4th at p. 101.)

Schmeder asserts that the court erred in denying his motion to augment the record to include Vernon's January 24, 2018 letter.  However, the court impliedly found that the letter was not relevant, explaining that the letter did not address any issue raised by Schmeder in either of his administrative appeals.  Although Schmeder argues the letter was relevant

to show that "Vernon . . . falsified his academic record," we have already rejected that contention above. Schmeder thus has not shown an abuse of discretion in the denial of his motion to augment the record to include Vernon's letter.

Schmeder also argues the court erred in declining to augment the record to include investigator Duncan's email regarding suggestions to the history department for future best practices. As discussed, Schmeder sought to introduce the email to show the University's "admission" of its failure to comply with section B(6) of the 1982 Memo. We rejected this argument, finding it purely speculative, given that the email is devoid of any reference to Schmeder, much less any admission of noncompliance. As such, Schmeder cannot show any abuse of discretion in denying his motion to augment the record to include the email.

Schmeder further asserts that although the trial court properly granted his motion to augment the administrative record to include the qualifying exam committee's May 9, 2017 report, it erred in failing to remand the case under section 1094.5, subdivision (e). We disagree.

The University correctly observes that section 1094.5, subdivision (e) is discretionary, not mandatory: the court "*may* enter judgment as provided in subdivision (f) remanding the case to be reconsidered . . . ." (Italics added.) As one court put it within the context of new evidence obtained after the administrative hearing, "Not every relevant piece of evidence occurring after the administrative hearing and relating to mitigation justifies a remand. Even weak and discredited evidence may meet the test of relevancy if it tends to prove some fact if believed. . . . [W]e read the use of the permissive 'may' in the statute as conferring discretion upon the court to remand the matter in an appropriate case. [Citation.] In order to avoid fruitless remands with

40

their attendant delay and cost, such a remand would be appropriate only when there is a reasonable possibility that the new evidence of mitigation would change the decision of the tribunal. Judged by this standard, the trial court did not abuse its discretion in this case by failing to remand the case to the Board for reconsideration." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 838.)

Here, Schmeder sought to introduce the report in order to refute the GDC's finding that the committee as a whole, rather than Mazzotti individually, determined that Schmeder's prospectus was not good enough for him to advance to candidacy by June 30. We find this argument problematic for at least two reasons. First, we already rejected the factual predicate of Schmeder's claim that Mazzotti had a motive to expel him for personal, nonacademic reasons. Without this premise, it cannot follow, as Schmeder suggests, that an improper agenda from Mazzotti pervaded the decision not to support Schmeder's advancement to candidacy on June 30.

Second, the report is remotely relevant to Schmeder's claim, as it was solely focused on Schmeder's performance in his second qualifying exam. Overall the report shows, as quoted by Schmeder in his brief, positive assessments by the committee, as well as Mazzotti and Carson individually, of his performance on the second qualifying exam. The report thus had nothing to do with Schmeder's prospectus, much less contain any approval or disapproval of it by any faculty member. Given the remote relevance of the qualifying exam report, there is not "a reasonable possibility that the [report] would change the decision of the tribunal," rendering a remand unnecessary. (*Department of Parks & Recreation v. State Personnel Bd.*, *supra*, 233 Cal.App.3d at p. 838.)

### *Motion to Strike*

Schmeder argues the trial court erred in denying his motion to strike

41

from the administrative record numerous documents related to his first appeal before the History Department's GAC. Schmeder states that because the documents were not admitted at the proceedings before the GDC, the University should be precluded from including them in the administrative record and relying on such evidence in the trial court. We reject these contentions.

Schmeder acknowledges that although he moved to strike the documents described above, he represented to the trial court that he intended to later file a motion to augment the record to include those very same documents. The court, understandably confused by this approach, responded: "So you are moving to strike it from the record now, which you are going to have to augment the record later with the very same documents?"

The court then pressed Schmeder to clarify his position. The crux of Schmeder's motion to strike was that the University improperly excluded evidence in the administrative proceedings. As such, Schmeder asserted, the University was not allowed to use the excluded evidence in the mandamus action to argue there is substantial evidence to support its decision to dismiss him. In response, the court asked Schmeder, "Will you be arguing that [the University's] refusal to consider the GAC documents was an error on their part, on the GDC's part?" Schmeder replied, "Yeah." Because Schmeder concedes that GAC appeal documents "were, indeed, relevant evidence," and because the administrative record "should contain all evidence the parties consider necessary to the resolution of contested issues" (*City of Fairfield v. Superior Court* (1975) 14 Cal.3d 768, 774, fn. 6), the court did not abuse its discretion in denying the motion to strike the documents.

Additionally, the court properly rejected Schmeder's assertion "that if a petitioner were to complain that evidence was excluded from a record, then

42

agencies would have, at their disposal a new tactic. They could add the evidence to the administrative record, and it becomes thereby substantial evidence . . . ." As the court intimated, Schmeder was assuming too much. Simply because the documents were included in the administrative record did not mean that the court was required to accept the University's interpretation of those documents. Rather, as the court explained to Schmeder, "You will have an opportunity to write a brief to tell me what you think I ought to glean from the administrative record, and you can make your arguments. [¶] There is no magic in having it taken out of the administrative record and put back in after a motion that you put in. It will be in [the] administrative record." The court added, "If you think that by putting documents into an administrative record that were excluded from a hearing that the Court is not able to understand the plain argument, that I shouldn't consider those for one reason but instead for another, in my view, it is an argument – you are just spinning your wheels here."

## DISPOSITION

The judgment is affirmed. Each party shall bear its own costs.

_____
Richman, J.


We concur:


_____
Stewart, P.J.


_____
Van Aken, J. *


*Schmeder v. The Regents of the University of California* (A162858)

    *Judge of the San Francisco Superior Court, Judge Christine Van Aken, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.